FRANKE v. THE CITY OF ST. LOUIS *et al.*, *Appellants*.

### In Banc, June 6, 1892.

1. **Tenant:** UNSAFE BUILDING: POSSESSION. The fact that a tenant whose term had expired was permitted by his lessor to keep an engine and boiler in the cellar did not give him such possession of the building as to render him liable for not maintaining it in a safe condition.

2. **Practice:** NON-JOINDER OF DEFENDANT: WAIVER. The objection of non-joinder of a party defendant is waived unless made by demurrer or answer.

3. **Cities and Towns:** SAFETY OF STREETS: NEGLIGENCE. Cities and towns must keep their streets and sidewalks in a condition reasonably safe for the public, and they are responsible in damages to persons injured in consequence of a neglect of this duty.

4. **Negligence:** OWNER OF BUILDING: UNSAFE WALLS. A similar duty devolves on the owner of a building under his own control, and in his own occupation, and no notice to him is required of its dangerous condition to render him liable for injuries resulting therefrom.

5. **———:** UNSAFE WALLS: LIABILITY OF CITY AND OWNER. Plaintiff's son was killed by a stone falling to the sidewalk, on one of the principal streets in the city of St. Louis, out of the front wall of the fourth floor of a building, burned three weeks before, so that the interior was totally destroyed and the rear and side walls were partly destroyed. A policeman whose beat was by the building testified that he saw it every day. One witness testified that, when passing the building a

day or two before the accident, he saw very high up about the fourth floor a stone in the front wall bulging out considerably which gave him the impression it was about to fall. The city building inspector examined the structure four times after the fire, the last time a week before the accident, and found it apparently safe. A contractor to make repairs stated he carefully examined the building the day before and discovered nothing wrong. The evidence also showed that no guards or signals of any kind were placed at the building. *Held*, that there was evidence to go to the jury of an open and obvious defect in the building, which it was the duty of the city and the owner of the leasehold to see and remove.

6.  **Practice:** DEMURRER TO EVIDENCE. A demurrer to the evidence admits every fact which the jurors may infer, if the evidence were before them, and should be sustained only when the evidence thus considered fails to make proof of some essential averment.

7.  ———: PROVINCE OF JURY. It is the peculiar and appropriate function of a jury to pass upon contradictory evidence.

8.  **Negligence:** DEATH OF BOY: VERDICT. A verdict of $1,846.46 for the death of the boy, who was fifteen years old, strong, robust and attentive to business and already earning $4, a week cannot be *held* excessive.

9.  ———: ———: CONTRIBUTORY NEGLIGENCE. The boy having no duty to look after the walls and having no warning cannot be charged with contributory negligence.

*Appeal from St. Louis City Circuit Court.*—HON. DANIEL DILLON, Judge.

AFFIRMED.

*Leverett Bell* for the City of St. Louis, appellant.

(1) It was improper to grant a nonsuit as to the defendant Hildreth. (2) The case should have been nonsuited as to the city of St. Louis. (3) It was error to refuse to submit to the jury whether the deceased came to his death by improper treatment on the part of the physicians. (4) The contractor who was restoring the premises at the time of the accident was jointly liable with the other defendants. (5) The question of reasonable care on the part of the deceased should

have been summitted to the jury. (6) The damages were excessive.

*W. C. Marshall*, also, for the City of St. Louis.

(1) The defect in the wall was not a patent one. (2) *Res ipsa loquitur. Vincent v. Cook*, 4 Hun, 318; *Weidner v. Railroad*, 41 Hun, 284. "The extent of the duty of the corporation is to use ordinary care in the performance of its duties. It is not, therefore, a general warrantor of the safe condition of its streets." 1 Shearman & Redfield on Negligence, sec. 290. "The corporate authorities are only bound to use reasonable skill and prudence in making the streets and sidewalks safe and convenient for travel. They are under no obligation to provide for everything that may happen upon them, but only for such things as ordinarily exist or such as may be reasonably expected to occur." 2 Dillon on Municipal Corporations, secs. 1015, 1020. (3) The city is not an insurer.

*Rowell & Ferriss* and *J. H. Zumbalen* for appellant, Mrs. Webb.

(1) The verdict is so opposed to the weight of evidence, so against the manifest truth of the matter, that it must have been the result of caprice, prejudice, passion or some cause other than the conviction or belief in the truth of the facts and liability of appellant under the law, even as declared by the trial court, and it should not be permitted to stand. *Whitsett v. Ransom*, 79 Mo. 258; *Spohn v. Railroad*, 87 Mo. 74; *Hipsley v. Railroad*, 88 Mo. 348; *Garrett v. Greenwell*, 92 Mo. 120; *Lionberger v. Pohlman*, 16 Mo. App. 392; *State v. Primm*, 98 Mo. 368; *Mayor v. Wilson*, 9 S. E. Rep. (Ga.) 17. (2) The instruction given for plaintiff is erroneous in that it makes no distinction between the

liability of the city of St. Louis and of Mrs. Webb for omitting to place barriers in the street. (3) *First.* The occupant, and not the owner is, *prima facie,* liable to third persons for damages arising from a defect in the premises. As defendant Hildreth was in joint possession with the contractor at the time of the accident, the court erred in instructing the jury to return a verdict for him. *Regina v. Watts,* 1 Salk. 357; *Staple v. Spring,* 10 Mass. 77; *Grogan v. Foundry Co.,* 87 Mo. 321; *Tate v. Railroad,* 64 Mo. 149; *Pinney v. Berry,* 61 Mo. 359. *Second.* The owner of property who has contracted with a builder to erect a building upon it is not liable for the negligence of the contractor or his servants, where entire possession has been surrendered to him. It was, therefore, error to refuse defendant's instruction. *Barry v. St. Louis,* 17 Mo. 121; *Morgan v. Bowman,* 22 Mo. 538; *Clark's Adm'r v. Railroad,* 36 Mo. 218; *Reedie v. Railroad,* 4 Exch. 250. *Third.* The evidence disclosed that the contractor was a necessary party defendant, and the plaintiff should have been nonsuited for failing to join him. Charter of City of St. Louis, art. 16, sec. 9; 2 R. S. 1889, p. 2143. (4) Under the evidence in this case the damages assessed are entirely unwarranted and excessive. *Railroad v. Barker,* 33 Ark. 350; *Hurt v. Railroad,* 84 Mo. 256; *Hickman v. Railroad,* 22 Mo. App. 351.

*Rassieur & Schnurmacher* for respondent.

GANTT, J.—The plaintiff as the sole surviving parent brings this action for damages caused by the killing of her unmarried minor son, Frederick W. Franke, on the twenty-ninth of February, 1888, by the falling of a stone from the front wall of the building number 407, North Fourth street, in the city of St.

Louis, the leasehold of which was owned at the time by Mrs. Rebecca Webb, one of the defendants. Prior to February 5, the three upper stories of the building had been leased to Hugh R. Hildreth, who was made a defendant also, for his printing establishment, and the first floor to Hirzog Bros., for a dry-goods store.

Fourth street was the principal retail thoroughfare of the city. On February 5, 1888, this building and its contents were burned. The front wall was built immediately on the line of the sidewalk. On the day in question, February 29, 1888, three weeks after the fire, plaintiff's son, then fifteen years old and unmarried, was walking north on Fourth street on an errand for his employer, and when just in front of the damaged wall, a stone about six feet long, thirty inches wide, and about four inches thick, fell out of the upper part of the wall between the fourth story windows, and injured the boy. While no one actually saw the stone come in contact with him, it is clear from all the evidence in the case, and from the character of the injury to the boy's head, as described by the medical witnesses, that the stone must have struck him a glancing blow. A number of people saw him in the act of falling, contemporaneously with the crash of the stone, and carried him to the nearest drugstore. He was there revived, and immediately sent home; he complained of pains in his head, and, as was drawn out of the plaintiff, and Dr. Bock, on cross-examination by defendant's counsel, stated, that a falling stone from a building on Fourth street had struck him. As his condition grew worse the following two days, a surgeon was called in by the attending physician, and an operation was performed on his skull in the hope of saving his life. The surgeon, Dr. Bernays, testified that when he had removed the scalp he was surprised at the horrible fracture of the skull that was presented; the fracture extended clear across;

it looked like the injury that would be produced by a blow with the flat side of an axe or board.

The testimony showed that, at the time of his death, plaintiff's son was a strong, healthy boy, earning $4 weekly, as an errand boy.

Under the instructions of the court the jury returned a verdict in favor of defendant Hildreth, and against defendants Webb and the city of St. Louis, for $1,846.46, and both defendants appealed.

OPINION.

The contention of both the appellants, that the circuit court erroneously sustained the demurrer to the evidence by the defendant Hildreth, is wholly without merit, whatever significance is given to section 9 of article 16 of the scheme and charter of St. Louis.

The mere fact, that by the sufferance of Mrs. Webb his engine and boiler remained in the cellar, did not give him such a possession of that building as to render him liable for not maintaining it in a safe condition. His lease was terminated, his rent was paid, and neither he, nor his employes, were in possession.

II. Nor can the non-joinder of the contractor, Lynds, as a defendant avail either of these appellants. If they desired to get the opinion of the court as to the necessity of making said contractor a party, it was clearly incumbent upon them to do so, either by demurrer or answer, and, having failed to do either, the objection was waived. R. S., sec. 2047. And, moreover, it is not made a ground for new trial, by either of these defendants.

III. Whatever the rule may be in other states, the law in this state requires that cities and towns shall keep their streets and sidewalks in a condition reasonably safe for the public, and they are liable in damages

to persons injured in consequence of a neglect of this duty.

"Whenever it is discovered by the officers of the city that a structure exists in the sides of one of its streets, so unsafe as to endanger the lives or persons of those passing over and along the street, the duty either to remove it or to make it safe and secure at once arises, and this duty cannot be shifted from the city to another so as to relieve it from liability for injuries occasioned by it." *Grogan v. Foundry Co.*, 87 Mo. 321; *Kiley v. City of Kansas*, 87 Mo. 103.

"The ground of the action is either positive misfeasance on the part of the corporation, its officers or servants, or by others under its authority in doing acts which cause the streets to be out of repair, in which case, no other notice to the corporation of the condition of the street is essential to its liability, or the ground of the action is the neglect of the corporation to put the streets in repair, or to remove obstructions therefrom, or to remedy causes of danger occasioned by the wrongful acts of others, in which cases *notice of the condition of the street*, or what is equivalent to notice, is necessary, as will presently be stated, to give to the person injured a right of action against the corporation." 2 Dillon on Municipal Corporations, sec. 1020.

It is not possible to state a rule of notice that would apply to every case in advance. Each case must depend upon its own peculiar facts and circumstances.

When the dangerous obstruction or abutting building is in a small village, or on a retired or secluded street, the inattention of the town or city authorities for several weeks might not amount, of itself, to negligence, and, on the other hand, if a dangerous over-hanging wall, or unprotected opening upon a sidewalk, upon one of the principal thoroughfares of a great city, was allowed to stand even a day without barricades or danger

signals, it would furnish sufficient evidence to justify a jury in finding notice. Negligence is necessarily a relative term, What would be care in a village of a few hundred inhabitants, with now and then a passer-by, would be gross negligence, if permitted in a city of a half million inhabitants, with its throng of busy people, constantly moving along its streets and sidewalks, intent upon business or pleasure, relying upon the city authorities to give notice or warning of danger. *Carrington v. St. Louis*, 89 Mo. 208.

In 2 Shearman & Redfield on Negligence, section 369, it is said: "For practical purposes, the opportunity of knowing, in such cases, must stand for actual knowledge; and, therefore, where open defects in a highway have existed for a considerable time, notice of them is *implied*, and is imputed to those whose duty it is to repair them; in other words they are presumed to have notice of such defects as they might have discovered by the exercise of reasonable diligence. Such notice may be imputed also where a defect, though temporary, has been of frequent occurrence during a long period; for example, where an individual has habitually used an unguarded cellar door in the sidewalk; but, on the other hand, it is not to be imputed where a lawful structure has been proved to be exceptionally safe during a long period. It is evident that notice should not be so readily presumed from the continuance of *latent* defects as in the case of such as are open; while others, like an unguarded precipice at the side of a street, or *a decayed wall hanging over a sidewalk*, are so dangerous as to *challenge immediate attention;* so that the jury may be warranted in finding a very short continuance of these notorious defects to constitute a sufficient notice of them."

In this case, the trial court instructed the jury in accordance with the law as above stated, in regard to

the liability of the city. As to Mrs. Webb, the court charged the jury, they could not find against her, unless they found from the evidence that the wall was in a dangerous and defective condition, and said danger was apparent, or that she was guilty of negligence in not discovering and protecting the same.

It is now urged in this court that the circuit court should have instructed the jury that plaintiff could not recover on the evidence in this case, against either the city or Mrs. Webb. It seems clear to us that the city occupies a position materially different from Mrs. Webb. Was there sufficient proof to take the case to the jury as to the city?

The plaintiff proved that a building four stories high, fronting on Fourth street in the city of St. Louis, had burned on the fifth day of February, 1888. The interior of the building with its stock of merchandise was completely destroyed, the rear and side walls were partly destroyed, the windows and window-sills in the front wall were burnt and charred. The trimming or facing of this front wall consisted partly of upright slabs of stone, six feet long, two and one-half or three feet wide and four inches thick, fastened to the wall by iron bolts or anchors.

Daniel Walsh, a police officer in the employment of the city, testified that this building was on his beat; that he observed it daily from the fire till the plaintiff was hurt on the twenty-ninth of February, twenty-four days after the fire.

Hugo Muench, a member of the St. Louis bar, testified: "I remember seeing these premises after the fire; I don't know when the fire occurred, but I saw them after the fire in a dismantled condition. Men were at work taking the *debris* out of the building. As I was going up on the east side of the street, I noticed one large rock or stone, which formed part of the front

wall, very high up, about the fourth floor, that bulged out very considerably. It was very large and gave me the impression at the time that it was about to fall. I looked at it quite a while; I looked at it on my return, and it was still there." He fixed the time by the account of the accident in the city press; he stated he saw the bulge in the wall a day or two before the accident.

It was shown by various witnesses that the plaintiff's son, a lad of fifteen years, was passing along the sidewalk when one of these upright stones fell and struck him, fracturing his skull, from which he died on the third or fourth day. No guards were up, or signals of any kind. He was earning $4 a week, and was a strong, robust boy. He always paid his earnings to his mother, who is a widow. The court having refused the demurrer to the evidence, the evidence disclosed the city had an inspector of buildings, who inspected this building some four different times after the fire. The last time a week before the accident to plaintiff's son. It was apparently safe. He did not see the wall the day of the accident.

For the defense, Benjamin Lynds testified that he made a careful inspection of this building on twenty-eighth of February, and discovered nothing wrong about it.

The rule is firmly established in this state that a demurrer to the evidence admits every fact which the jurors may infer, if the evidence were before them, and should be sustained only when the evidence, thus considered, fails to make proof of some essential averment. *Rine v. Railroad*, 100 Mo. 228; *Noeninger v. Vogt*, 88 Mo. 592, and cases cited; *Meyers v. Kansas City*, 108 Mo. 480.

Can it be said the jury were not at liberty to believe Mr. Muench's testimony? They saw him; living

in the same city, they probably knew him. If they did, believe him, then it was a fact that for a day or two this large stone hung from the ruins of this burnt building threateningly over a street and sidewalk, where human beings were walking every moment, unconscious of their danger, and the police officer on this beat might have observed this as well as Muench, Add to this the knowledge the city had through her inspector, that this wall had stood there, without any supports for three weeks, after having been exposed to a hot fire, and we think there was sufficient evidence to go to the jury.

But it is said Lynds contradicts Muench. It was for the jury to determine whether they would believe Lynds or Muench. It is evident they believed Muench, It is the peculiar and appropriate function of the jury to pass upon contradictory evidence. With Muench's testimony in the case it is evident that was not a latent defect. On the contrary, it was open and obvious, and it must follow, from the law, that if so it was the plain duty of the city officers, and the owners of this building, or those in possession at the time to see it, and remove or secure this stone.

IV. As to Mrs. Webb, however, the law did not require the plaintiff to prove actual notice. "It is the duty of the owner of a building, under his own control and in his own occupation, to keep it in such safe condition that travelers on the highway shall not suffer injury." When the dangerous condition of the wall was shown, and the injury resulting from it, a *prima facie* case was made as to the owner in the possession, *Krohn v. Brock*, 144 Mass. 516; *Gray v. Gaslight Co.*, 114 Mass. 149; *Barnes v. Beirne*, 38 La. Ann. 280; *Mullen v. St. John*, 57 N. Y. 567; *Kearney v. Railroad*, L. R. 5 Q. B. 411; Exchequer Chamber, 6 Q. B. 759;

·Cooley on Torts, star p. 665; 1 Thompson on Negligence, 349.

The court very carefully instructed the jury in the fourteenth instruction given for Mrs. Webb "that they ·cannot hold the defendant, Mrs. Webb, responsible for the injury in this case simply because she was the owner ·of the leasehold when the wall fell; but in order to hold her responsible they must further find that she had the possession or control of the premises at the time of the accident." It was left to the jury to find whether she was in possession or not. The evidence was sufficient to justify the jury in saying she was. Her tenant Hildreth paid his rent and obtained his acquittance on the sixth day of February. The wrecking company cleaned up the *debris* for the insurance companies, and finished about the twenty-fifth.

Lynds says he didn't take charge until about March 15 to rebuild. It was competent for the jury to find under the evidence that as the owner of the leasehold she was in possession, until some one else took the actual possession.

V. At the instance of Mrs. Webb's attorneys, the court gave a 'correct instruction as to the measure of damages, as follows: "13 The jury are instructed that if they find a verdict for the plaintiff they are to assess the damages for such sum as will compensate the plaintiff for the loss of her son's services from the date of his death to the time when he would have arrived at the age of twenty-one years, and for the burial and other expenses, if any, incurred by her by reason of his sickness and death, and they are not permitted to allow the plaintiff anything for the mental care, anguish and suffering which she endured by reason of the death of her son." *McGowan v. Ore & Steel Co.*, .109 Mo. 518.

It is now said the verdict is excessive. The evi-
dence shows the boy at fifteen years of age was already
earning $4 a week. He was strong and robust and very
attentive to business. While the law limits the recovery
to his minority, the jury had a right to assume his
earning capacity would increase as he grew older.
There cannot be an exact mathematical estimate of the
value of his life. There is nothing in this verdict of
$1,846.46 that smacks of prejudice or passion.

VI. Nor was there any evidence upon which to
base the instruction as to the boy's contributory negli-
gence. Unlike the defendants, he was charged with no
duty to look after the walls to this building. Without
warning of any kind, he had a right to assume he could
safely use the sidewalk on this street. *Roe v. Kansas
City*, 100 Mo. 190.

Finding no error in the record, the judgment is
affirmed. All concur except SHERWOOD, C. J., who
dissents.

SHERWOOD, C. J. *(dissenting)*.—Action by plaintiff
as the mother of her minor son, some fifteen years of
age, who was killed by the falling of a large facing
stone, situated in the fourth story of the front wall of
the brick building known as number 407 North Fourth
street.

A fire had occurred in that building on the fifth of
February, and the accident happened on the twenty-
ninth of that month. There was no dispute as to the
immediate cause of the death. There were no barriers
erected in front of the burned premises, and travel
continued as before along the sidewalk, which was a
busy thoroughfare.

At the close of the plaintiff's case, the defendant city
and the codefendant, Mrs. Webb, who had a leasehold

estate in the premises, demurred to the evidence, but without avail.

All the material portions of the testimony bearing on the issue of the negligence of the defendants will now be set forth:

A. G. Peterson testified that he was a merchant at 409 North Fourth street, just north of the buildings where the fire took place, early in February, 1888; that the front wall was situated straight up against the edge of the inner sidewalk; the house was four stories high. * * * The fire left the inside of the building entirely burned out; the second, third and fourth floors all fell down into the basement and left the walls standing; up to the twenty-ninth of February there was no change in the wall on Fourth street; that they had begun to take out the refuse—the old paper, goods, and one thing and another; that he was standing in his store near the door talking to a gentleman when he heard this crash; from his door to where the boy was hurt is about twenty-five feet; as soon as the crash took place he looked that way and saw the boy sitting down, with his legs setting out like that (indicating), and was bracing himself behind. * * * He did not see the boy before he was struck; the material had fallen from the fourth story, from between two windows; it was the outer sandstone covering, and was, he judged, six or seven feet long; it came out of number 407 North Fourth street. * * * There was nothing on the pavement prior to the accident to hinder people from walking there, nor was there any sign warning passengers not to walk on the pavement. * * * The stone was six feet in length and probably thirty inches wide and three inches thick; it formed part of the outside covering of this building, and fell a height of more than thirty-five feet; * * * It weighed two hundred or three hundred

VOL. 110—34

pounds. * * * The wreckers were taking out the burnt paper and machinery, and getting ready to rebuild; the store has been rebuilt, but not the front wall; a new stone was put in the upper story of the front wall; he was right next door all the time, but did not know of any other stones falling out.

William S. Woods testified that he is in the coal business; that he was walking south on west side of Fourth street, and was about fifty or seventy-five feet north of number 407 when a stone fell from that building. * * * He saw nothing to indicate that there was danger in passing there. * * * There had been a fire there, but he did not remember definitely when; the windows were burnt out and the front had a sort of general appearance of wreck on the lower floors particularly; but, in the main, it looked as though the front wall was in a condition to be retained as it was. * * * The stone had reached the ground before the witness saw it; he afterward saw the place in the wall where the stone came out of; the stone was probably six feet long, not quite three feet broad, and perhaps four inches thick, and weighed, he thought, between fifty and one hundred pounds.

David Shaw testified that on February 29, 1888, he worked in a clothing store at 314 North Fourth street; that on that day, somewhere between eleven and twelve o'clock, he was standing in front of the store and looking toward number 407, on the other side of the street; that he saw the rock when it came down from the outside wall; it was about four inches thick; it was the slab between the two windows in the fourth story; the wall stands on a line with the street; he saw it just as it fell.

Hugo Muench testified that he is an attorney at law; that some time after the fire in the Hildreth building, as he was going up on the east side of Fourth

street, he noticed there was one large stone, which formed a part of the front wall very high up on the fourth floor, he thought, that bulged out very considerably; did not remember the size of the stone, but it was very large, and gave him the impression at the time that it was about to fall; his impression was it was very near the middle of the building; he did not know of his own knowledge that an injury occurred there.

"Q. Did you notice any report of an injury in the newspapers? (Defendants' counsel objected to the question.)

"The Court: I suppose you want in that way to get him to fix the time?

"Mr. Rassieur: Yes, sir."

The court overruled the objection, to which ruling defendants then and there duly excepted.

"The witness: I did."

He then stated that he had noticed the stone a day or two before the accident happened.

Defendant objected to this testimony as irrelevant and incompetent; objection overruled, and defendants excepted.

On cross-examination, he said that he did not notify the city of the condition of the stone at any time. People were passing in front of the building at the time; he passed there himself without thinking of the stone at all until he had passed, and then it occurred to him that may be he had done a foolish thing, and he stopped and looked at the stone again; that the *debris* was being taken out of the building at that time, and there was a pile of material in the street.

Daniel Walsh testified that he had been on the police force over seventeen years; that in February, 1888, his beat included the premises at 405 and 407 North Fourth street; that he was at the corner of Fourth and Locust when a portion of the front wall fell down at 407 North

Fourth street;   *   *   *   the rock had fallen from the fourth story between the north and middle windows. It was an upright between the north and middle windows.   *   *   *   About three days after the fire they began to take out the *debris;* on February 29 the men were taking the roof off, he thought.   *   *   *   Mr. Lynds was the contractor that was at work on the ruins, getting it ready to rebuild;   *   *   *   the front wall of the building is used there to-day; the building is now repaired and occupied; the stone that fell out of the front wall has been replaced.   *   *   *   He was on duty there the night that the building burned, and continued on duty there up to the time of the accident; between those dates he passed there continually, walking along that sidewalk several times the morning of the accident; there was no appearance of danger that he could see.

On the part of the defendants the following is the substance of the testimony bearing on the question at issue:

John T. Hester testified that he was employed by the city as inspector of buildings; that he was a bricklayer for thirty-one years before he became building inspector; that he was familiar with the construction of buildings; that on the second day after the fire he made an official inspection of the premises for the purpose of ascertaining whether the walls were dangerous or safe as to persons using the sidewalk; that he examined the front wall carefully and noticed in one or two places that the pilasters were slightly chipped by the fire and water, as he thought; that there was no indication at that time that any of the stones in the front wall were likely to slide out; that he examined the wall four times in all prior to the stone falling, but he never saw anything to indicate that that stone or any other portion of the front wall was going to

fall; that on each inspection he went on each floor, put his head out of the windows, and sighted along to see if the piers were in range as they were when built, and he found them all in good range, straight; that his last inspection was about a week before the accident; that he at no time discovered any danger to persons using the sidewalk. He stated that he did not see the premises on the day of the accident; that he did not order guards to be placed there; that he had the right to order guards to be placed there if he saw danger; that the *debris* was being removed during his last inspection; that the removal of the *debris* causes more or less injury which weakens a building; that on the stone front building the stone front is anchored to the brick work; that he thought it would take a great deal of heat applied direct to loosen such an anchor; he never saw one where it did; that the stone which fell out of this wall was fastened to the brick work by iron anchors; that he saw the anchors afterwards; and it was still in good condition in the brick work, not broken off; that heat sometimes cracks a stone wall; that he could not say how the stone came to fall; that he went on every floor and' onto the roof when he inspected the front wall; that part of each floor remained in the front part of the building.

Benjamin Lynds testified that he is a builder and has been in that business for thirty years in St. Louis; that he went over the buildings, numbers 405 and 407 North Fourth street, the day after the fire there at the request of Mr. Kaime and the insurance companies, with a view of seeing if the parts standing were in a safe or dangerous condition; that he and Mr. Ross afterwards appraised the damage to the building for the companies and Mrs. Webb; that he was engaged there in that work about ten days; that he examined all parts of the building, from the cellar to the roof; that he saw

Mr. Hester, the city inspector, there several times; that Mr. Hester pointed out a portion of the south wall as being unsafe, and the insurance companies ordered it to be taken down, and he had the St. Louis Wrecking Company take down the dangerous part; it was part of the south-wall, eighty feet from the front wall; that was all that was pointed out as being dangerous, and all that he saw that was out of line. The front wall appeared to be all right; the fire had not come up to the front wall; there was quite a large part of each floor left and of the roof; about fifteen feet of each floor back from the front wall was intact. The front wall appeared to be all right, except there were some corners of the stones which were chipped a little; that he examined the stone in the front wall very carefully all over from top to bottom; he was there to appraise the damage, and in order to do so he had to inspect it very closely to know what had to be taken down; he examined the front wall to see whether it would have to be taken down or not, and concluded these stones would have to be taken out on account of the chipping of the arrises, but not on account of any danger of falling out, as they appeared as sound as the other piers which are still standing; that all the piers are still standing, except this one; that he went through the building on February 27 and 28, to take the measure of some window frames that were to be replaced; that on February 28 he measured the window adjoining the pier whence the stone afterwards fell, and he was measuring around every pier on the whole front; that he did not notice any change in this pier from the first time he had examined it; did not see any bulging, or anything to indicate that it was liable to fall; that, if this pier had been bulging out in any way he would certainly have noticed it; that the St. Louis Wrecking Company had been working there about two weeks, taking

out the *debris* for the insurance companies; he thought they had finished a day or two before the accident; that the outside of the front wall was stone four inches thick, and the back part was brick, thirteen inches thick; that the stone fell from the fourth story; that on February 27 he entered into a contract to repair and rebuild the premises; that no other stones fell out of the wall, except this one; some had to be taken down afterwards in order to replace the fallen stone, and they were found to be securely fastened to the wall; that he rebuilt the premises under his contract for a lump sum of money; that in order to enable him to make such a contract he had to know precisely what had to be replaced; if any of the stones in the wall were loose he had to replace them, and his examination was made with that view; that he gave a particular examination to every stone in that story; that, if there had been anything in the appearance of this stone to indicate that it was about to fall, or that for any reason it was necessary to remove it, he would have seen it, because he had his hands on this pier several times; that he made as careful an examination as a man could have made if sent to inspect that pier, but did not discover any sign of that pier giving away; why it gave way he didn't know, but there was no outward sign to him; that, if there had been a crack in that pier, he would certainly have seen it; that he went there on the twenty-eighth to make measurements with a view of executing this contract with Mrs. Webb to restore the building; that after he had taken the contract to rebuild he employed the St. Louis Wrecking Company to take down such portions of the wall as were to come down and to remove the *debris* from those walls; that he did not know on what day the wrecking company commenced work; that the wrecking company did two jobs there, one for the insurance companies and one

for him. He stated that the examination he made to ascertain the loss on behalf of the insurance companies and Mrs. Webb was going on from about the eighth to the twenty-fourth; that, in estimating the loss, Mr. Ross and himself disagreed as to certain portions of the building, and such portions were re-examined by them; that the examination was very careful, because as one of them expected to restore the building, if they overlooked any defective part, they would have to restore it at their own expense; that he went into the different floors to see whether there were any cracks or fissures in the stones of the front wall; that he had to take down the pier from which the stone fell in order to replace the stone, but it was not out of line; that all the window frames in the fourth story were charred; that the wrecking company had commenced work under his contract by the first of March, and finished about the middle of March.

Wm. Atchison, president of the St. Louis Wrecking Company, who has been engaged in the wrecking business some five years, testified that his company was employed to remove the *debris* and salvage for the insurance companies after the fire at 407 North Fourth street; that his contract was with Butler, Collins & Powell, who represented the insurance companies; that this work was finished before February 28; that the wrecking company afterwards did another job there for Lynds & Co., taking down some portions of walls; that the company started to work on this contract with Lynds on the morning of February 29, at about eight o'clock; that he commenced work on the burned buildings on the morning of February 29; that the St. Louis Wrecking Company is a corporation, and its home is St. Louis; he was to take down such portions as needed to be taken down, in order to pave the way for rebuilding; that one or two piers of the front wall

were taken down after the accident; that at the time of the accident he was in the rear of the Hildreth building putting up a shed to protect an adjoining skylight; that his business is very dangerous, and he always examined a wrecked building before putting his men to work to see that they are not exposed to dangers; that he examined these premises that morning before going to work, but saw nothing to indicate any danger. He stated that he had no reason to pay any special attention to the front wall on the twenty-ninth of February; but that. he had to examine it while taking out the *debris* for the insurance companies a few days previous; that |several days before the fall of the rock Mr. Lynds asked him to make a bid for taking down certain parts of the walls; that did not include any part of the front wall, but Lynds said: "Perhaps we will alter the front some, and a portion of that may have to come down."

OPINION.

The foregoing statement of the material facts in evidence in this cause has been made at considerable length and fulness, in order to determine whether the instructions in the nature of demurrer to the evidence offered by the respective defendants at the close of plaintiff's case, should have been given.

Here the charge is negligence, and, where this charge is made against a municipal corporation, it is said: "The duty of a municipal corporation to manage and maintain its public works, such as sewers, water-pipes, streets and bridges, in such a condition of repair that they shall not cause damage to another, does not, in the absence of a statute to that effect, raise an absolute liability on the part of the corporation for every injury caused by a defect in such public works. The extent of the duty of the corporation is to use ordinary

care in the performance of its duties. It is not, there-- fore, a general warrantor of the safe condition of its streets; negligence on the part of its officers must be affirmatively shown; the mere existence of an obstruc- tion or other defect in a street causing injury is not enough. It must not only appear that the defect could have been prevented or cured by the use of ordi- nary care, but the corporation must in some way be connected with the defect, as, for example, by having directly caused it, or having assented to its creation by another, or having, with actual or constructive notice of its existence, permitted it to remain." 1 Shearman & Redfield on Negligence [4 Ed.] sec. 290.

Touching negligence, it is elsewhere aptly said: "The liability is not that of a guarantor of the safety of the traveler. The corporate authorities are only bound to use reasonable skill and diligence in making the streets and sidewalks safe and convenient for travel. They are under no obligation to provide for every-- thing that may happen upon them, but only for such things as ordinarily exist or such as may reasonably be expected to occur." "The ground of the action is either positive misfeasance on the part of the corpora- tion, its officers, or servants, or by others under its authority, in doing acts which cause the streets to be out of repair, in which case no other notice to the cor- poration of the condition of the street is essential to its liability; or the ground of the action is the neglect of the corporation to put the streets in repair, or to remove the obstructions therefrom, or to remedy causes of danger occasioned by the wrongful acts of others, in which cases notice of the condition of the street, or what is equivalent to notice, is necessary, as [will pres- ently be stated, to give to the person injured a right of action against the corporation." 2 Dillon on Munic- ipal Corporations [4 Ed.] secs. 1012, 1020.

Another writer says: "In order to establish a case of negligence and fix the liability of the defendant, it is incumbent on the plaintiff to prove some fact which is more consistent with negligence of the defendant than the absence of it; and where the plaintiff's evidence is equally consistent with the absence as with the existence of negligence on the part of the defendant, the plaintiff must fail; *a probability* is not sufficient." Black on Proof & Pleadings in Accident Cases, pp. 10, 11, and cases cited.

Speaking of when notice of the defect or danger in the highway will be implied, and so charge the city, the authors first quoted, *supra*, say: "For practical purposes, the opportunity of knowing, in such cases, must stand for actual knowledge; and, therefore, where open defects in a highway have existed for a considerable time, notice of them is implied and is imputed to those whose duty it is to repair them; in other words, they are presumed to have notice of such defects as they might have discovered by the exercise of reasonable diligence. Such notice may be imputed also where a defect, though temporary, has been of frequent occurrence during a long period; for example, where an individual has habitually used an unguarded cellar door in the sidewalk; but, on the other hand it is not to be imputed where a lawful structure has been proved to be exceptionally safe, during a long period. It is evident that notice should not be so readily presumed from the continuance of *latent* defects as in the case of such as are open; while others, like an unguarded precipice at the side of a street, or a decayed wall hanging over a sidewalk, are so dangerous as to challenge immediate attention; so that the jury may be warranted in finding a very short continuance of these notorious defects to constitute a sufficient

notice of them." '2 Shearman & Redfield on Negligence, sec. 369, and cases cited.

In instances like the present, express notice must be brought home to the municipality, or, if the defect be so notorious as to be observable by all, this is tantamount to express notice. *Mayor v. Sheffield*, 4 Wall. 189. Thus, in *Requa v. City of Rochester*, 45 N. Y. 129, where some planks were removed by some unknown person from a bridge used by the city, FOLGER, J., after speaking of the necessity of actual, or of its legal alternative or equivalent, implied, notice, in order to charge the city with liability, said: "In looking into the facts in this case, it is plain to us, that the defect in this bridge had existed for some days before the accident, and was known to many of the inhabitants of the city. The jury have found that the existence of it had been communicated to one of the members of the common council. Though this would not, under all circumstances, be proof of an express notice to the city of the defect in the bridge, it was proof of the notoriety of it. We think that there is sufficient to bring the case within the alternative above put, and that it was so notorious as to be observable by all."

In *Hume v. Mayor*, 47 N. Y. 639, the facts were these: "Plaintiff was injured by the fall of a wooden awning over a sidewalk upon one of defendant's streets. The awning was constructed in the usual manner, by competent mechanics, with timbers of proper form and size. Four months prior to the accident the awning had been injured by a fire engine running against it. It was repaired by a competent mechanic who did what he supposed necessary to make it safe. A day or two before the accident there had been an unusually heavy fall of snow, and a heavy body of it remained upon the awning. That part of the awning which had been repaired gave way," and the court refused to charge that

it the awning was originally constructed in accordance with the city ordinance, but was subsequently weakened by an accident whose effect was so secret that it could not be discovered by an experienced workman, and the injury was really caused by such secret weakness in conjunction with a deposit of snow upon the weakened part, the jury should find for the defendant. And this refusal was held error, ALLEN, J., remarking: "The jury might also have found, even if they had found that the awning had not been properly and safely constructed, that the defects were of such a character that it was not evidence of negligence or omission of duty in the city authorities to be ignorant of or to have overlooked the fact. The city authorities are not bound to be experts or skilled in mechanics and architecture, and can only be held to the extent of reasonable intelligence and ordinary care and prudence."

In Vermont it is held, under certain statutory provisions that the duty of towns to keep their highways in good and sufficient repair is not "to be measured by the exercise of ordinary care and diligence;" that a higher degree of care is requisite to satisfy the demands of the statute, and yet it was held in that state that where the defendant town's highway gave way in consequence of some latent defect under the ground, which was not known or discoverable, and the plaintiff's horse was injured, it was held that the town was not liable for the injury. BARRETT, J., remarking, "It was a latent defect under the ground, not discoverable, and which the authorities of the town could not have learned about. To hold the town liable in this case would establish a principle and rule that would render the town liable as absolute insurers against the consequences of all defects, however produced." *Prindle v. Fletcher*, 39 Vt. 255.

Various instances are to be found in the books, where municipalities have been held not liable on the theory of implied notice; and such theory will be found upon examination to be composed of two elements, one being such lapse of time during which the defect in the highway or·structure overhanging the same exists and from which duration of the defect notice is imputed to the city though the defect be not so obvious as to challenge the immediate attention of ever passer-by; the other,·the notoriousness of the defect, owing to the publicity of its locality, and such conspicuousness in that defect as naturally causes it *to obtrude itself upon the public eye, at once arresting attention and compelling observation,* in 'which case the bare notoriety of the defect and its conspicuity will shorten the time otherwise necessary to make notice, and its legal 'corollary, negligence, imputable to the city. For instance, see authorities already cited, and the following:

In *Klatt v. Milwaukee,* 53 Wis. 196, it was held that notice could not be imputed where the barrier at a street opening was up at four P. M., was removed by a stranger, and the accident occurred at nine· o'clock the same evening, and that it could not be where the accident happened on the seventh of the month, and the street superintendent had found the sidewalk not out of repair on the *first (Goodnough v. Oshkosh,* 24 Wis. 549); and where the defect had existed but for one day *(Sheel v. Appleton,* 5 N. W. Rep. 27); and where the sidewalk had been laid but *seven* days, and was in a *remote* street *(Chicago v. McCarthy,* 75 Ill. 602); and where it snowed on Thursday, then rained and froze, and plaintiff fell on the ice thus formed, on Sunday *(Mueller v.·Newburgh,* 32 Hun, 24); and where plaintiff fell at one P. M. on ice which had formed the night before *(Blakeley v. Troy,* 18 Hun, 167); and where it

snowed on November 28, then rained and froze, and the plaintiff slipped on December 4 (*Smith v. Brooklyn*, 36 Hun, 224).

Where the flag-stone of a sidewalk had three supports, and was cracked over the middle one, the court said that if the defect in the sidewalk "was of such a nature as not to cause a reasonably prudent man, whose business it was to look after the repairs of the street, to suspect its dangerous condition, or if it would not, in view of all the circumstances, put him upon inquiry to examine its condition, then there would not be notice." *Joliet v. Walker*, 7 Ill. App. 267.

In *Mayor v. Wilson*, 9 S. E. Rep. 17, the case was this: "The afternoon before the plaintiff was injured, the hardest rain of the season fell. Before the rain, and afterwards, the marshal of the town went to the place, and examined it carefully, and could not detect any defect in the sidewalk or the sewer. The injury was caused by the dirt and sand becoming very wet from the hard rain and caving in one side of the sewer. *Held*, that plaintiff was not entitled to recover, the defect not having existed for a sufficient length of time from which notice thereof could be inferred on the part of the town."

In that case SIMMONS, J., said: "According to the evidence in this record, the officers and servants of this municipal corporation exercised all the care and diligence that was possible, under the circumstances. They examined this sewer twice in one day. It had been there for years, and nothing had ever occurred to put them on notice that there was any defect in the sewer, or that it was dangerous, or likely to become so. A municipal corporation cannot be held liable for damages occurring by reason of a defect in its streets, sidewalks, sewers or bridges, when it has no notice thereof, or when such defect has not existed for a suffi-

cient length of time from which notice can be inferred. * * * According to the testimony in this case, this defect was of such a recent origin that the officers of the town government could not possibly have had notice of it, and we think, therefore, that the jury found contrary to the evidence. Judgment reversed."

In *Grogan v. Foundry Co.*, 87 Mo. 321, the evidence showed the fire occurred on the ninth of January, 1881, which partially destroyed the building, leaving its walls in a shaky and ruinous condition, and which condition was very obvious, at least eight or ten days before the walls fell; so much so that Rohan, on the twenty-ninth of March, who was doing business on the opposite side of the street, seeing the dangerous condition of the wall, and feeling it was his duty to do so, notified in writing the proper authorities of its unsafe condition. Upon this notification, *but not before*, and for the *first time*, the city sent an officer to inspect the wall, and the next day after such inspection the wall fell. No comment is necessary to show the entire absence of parallelism between that case and the case at bar.

Nor does *Carrington v. St. Louis*, 89 Mo. 208, at all resemble this one. There, Batte, a policeman and "*an officer, an agent of the city*," propped the cellar doors open with a stick; painted them and left them to dry, from between one and two o'clock until about half past five o'clock in the afternoon, after it was dark, when the plaintiff fell upon the doors and was injured. Besides, these doors covered a cellar-way opening into a building used by the police commissioners as a police station, a place, of course, of great travel and great publicity. "The sidewalk at this place was much resorted to for travel, so much so that scarcely ten seconds of time intervened between the time in which persons would pass and repass both day and night." And it is expressly said in that case, that "assuming that

the policeman was *not* the agent of the city, *then there is no evidence that any agent had knowledge of the defect.*" But it was ruled that the policeman *was* "the officer and agent of the city," and his knowledge of the defect "notice to and knowledge thereof on the part of the city."

There the "officer and agent of the city" did the very act which resulted in the litigated injury, and there, too, were the elements of notoriety and publicity. When you come to read that case, you cannot doubt that, but for the fact that Batte was ruled to occupy the official capacity aforesaid, even the conspicuous nature of the defect would not, during the time which elapsed, have been ruled to be a basis of municipal liability. Here, on the contrary, the defect which caused the injury, under the authorities must be regarded for the purposes of this case, as a *latent* defect, when it is considered what care and caution were exhibited by Hester, the city inspector, and by Lynds, the agent and contractor for Mrs. Webb. If such thorough, complete and repeated inspections and examinations as were made in this case do not fill the measure of duty required at the hands of the respective defendants, and all parties similarly situated, then each of them must be regarded in the light of warrantors or insurers of the safety of those who use the municipal highways.

As to Muench's testimony, it may be remarked, that, of all the thronging thousands, composing the human flood that with ceaseless tide went swirling by 407 North Fourth street, he alone possessed a vision sufficiently acute to detect the bulge in the facing stone which fell in a "day or two" afterwards; but he hid his secret in his breast, revealed it to no one, and so the city had no benefit of his keenness of vision.

In these circumstances, neither the city nor Mrs. Webb should be held derelict in their duty, as neither had any notice of the defect, after all necessary and reasonable precautions were taken to discover it; a defect which was not palpable, obvious or notorious, and, therefore, not at all calculated to arrest attention and to compel observation. This being the case, the verdict having no evidential basis on which to rest cannot support the judgment recovered, which should be reversed.

Unable to concur in the foregoing opinion, I herewith refile my original opinion as expressing my dissenting views herein.