BIERMANN v. THE CITY OF ST. LOUIS, *Appellant.*

### Division Two, February 27, 1894.

**Negligence:** DEFECTIVE SIDEWALK: QUESTION FOR JURY. In an action against a city for personal injuries caused by a defective sidewalk the evidence showed that the alleged defect was a perpendicular rise about six inches high. The step was caused by abutting building lots not being brought to grade. The city engineer, seventeen years before the accident, had ordered the property owners to lower the sidewalk to grade. There was nothing in the topography of the city making the step necessary. The defendant fell on a dark night and received the injuries complained of. *Held,* that the question of negligence was one for the jury.

*Appeal from St. Louis City Circuit Court.*—HON. L. B. VALLIANT, Judge.

AFFIRMED.

*W. C. Marshall* for appellant.

(1) The instruction for a nonsuit should have been given. Courts will not inquire whether the grade adopted is the best one, or whether one causing less damage would not equally have answered the purpose intended. *Roberts v. Chicago,* 26 Ill. 249; *Snyder v. Rockport,* 6 Ind. 237; *Reynolds v. Shreveport,* 13 La. Ann. 426. (2) The court erred in giving erroneous and conflicting instructions.

*J. J. O'Connor* for respondent.

(1) That the accident occurred, is some evidence that the offset in the sidewalk rendered it dangerous; besides, the question of whether or not the offset rendered the sidewalk dangerous to travelers at night was given to the jury on instructions favorable to appellant,

and this court will not disturb the finding of the jury thereon. *Blanton v. Dold*, 109 Mo. 65; *Tabler v. Railroad*, 93 Mo. 79. (2) It is the duty of defendant city to keep its sidewalks on the public streets in a reasonably safe condition for persons traveling thereon, and to keep the same free from all obstructions, or steps or unevenness of grade that would be dangerous to persons traveling thereon, or where it is necessary to have such things on the sidewalk, then to use ordinary care to guard the same to prevent injury to travelers. *Norton v. St. Louis*, 97 Mo. 537; *St. Louis v. Ins. Co.*, 107 Mo. 92; *Roe v. City of Kansas*, 100 Mo. 190. (3) Plaintiff's instructions are correct. *Roe v. City of Kansas*, 100 Mo. 190; and only conflict with respondent's instruction number 6, because number 6 is erroneous and should not have been given, and the error therein is in appellant's favor and of this he can not complain. *Reardon v. Railroad*, 114 Mo. 406; *Vail v. Railroad*, 28 Mo. App. 372. And appellant's instruction number 3 is also erroneous in putting the burden of proof on plaintiff to show that he used ordinary care to avoid the injury. It was appellant's duty to allege and prove the want of such care in plaintiff if it could. *Parsons v. Railroad*, 94 Mo. 287; *Donovan v. Railroad*, 89 Mo. 147. Besides, there is nothing before this court to show that appellant saved or urged any exception to the instructions in a motion for new trial; the question can not be raised here for the first time. *State v. Nelson*, 101 Mo. 477. This cause was submitted to the jury on instructions highly favorable to appellant; it should ask no more. *Ridenhour v. Railroad*, 102 Mo. 207.

GANTT, P. J.—This is an action for personal injuries, originally commenced before a justice of the peace in the city of St. Louis. The amended state-

ment, on which the trial was had, avers that the city is a municipal corporation charged by law with the duty of keeping its streets and sidewalks in such repair and so free from defects, obstructions and nuisances as to cause them to be reasonably safe, for persons using ordinary care, to travel thereon; that Third street is a street in said city; that on the west side of said Third street, between Locust and Vine streets, there is a sidewalk, and on said sidewalk and at or nearly in front of house number 409 north in said Third street, there is a perpendicular rise or step nearly six inches high, extending across the whole width of said sidewalk, rendering said sidewalk uneven, defective and unsafe for persons to travel thereon; that on the night of the thirtieth of May, 1891, about the hour of 10 o'clock P. M., plaintiff while traveling on said Third street, stumbled and fell over said rise, through being tripped by said rise, and sustained great injury to his person; that said rise caused said sidewalk to be dangerous and had existed for many months prior to plaintiff's injury; that defendant city well knew, or by the exercise of ordinary care could have known, that said rise was in said sidewalk and rendered it dangerous and unsafe for persons to walk thereon, but negligently suffered and permitted it to remain in such unsafe condition, without causing any light or notice or guard to be placed thereat to warn travelers of said rise; that by reason of said fall plaintiff broke the cap of his left knee, bruised and injured his left side and sustained other hurts, which confined him to his bed six weeks and caused him to expend money for medicine and medical aid, to his damage in the sum of $300.

Plaintiff recovered in the justice's court, and defendant appealed to the circuit court, where, upon a trial *de novo*, he again recovered judgment for $250, from which the city appeals to this court.

I. It is first insisted by the city that its demurrer to the evidence should have been sustained. The evidence for the plaintiff tended to prove that on the thirtieth day of May, 1891, he had gone to Jefferson Barracks to observe Decoration Day; that he was the flag bearer of his post on that occasion; that they returned to the city on the steamer "Oliver Bieme," and reached the landing about half past 9 o'clock that night; that with his companions they were going north to their quarters to leave the flag, marching north on Third street; then when he was passing along on the west side of said street on the sidewalk nearly opposite the building number 409, North Third street, he struck a perpendicular rise in the sidewalk about five and one-half inches higher than the level of the walk, and fell and severely injured his knee cap and elbow; the walk was made of stone or asphaltum; that he was confined to his bed six or seven weeks, and was still lame and unable to work; that he was a carpenter by trade and made from $2.50 to $3 per day; that he had been unable to work since; that he had spent $5 or $6 for medicines; that there was no light or guard at the place where he fell; that there was an electric light in the neighborhood "but he didn't believe it was lit;" that he did not know of this sudden rise in the walk; that he had not walked on that portion of the street for six or eight years. He didn't see the rise; denied that he was careless in walking along the street.

Thomas H. Macklind, a district engineer in the street commissioner's department, testified he was in the employment of the city and had been for twenty-three years, consecutively. When asked if he was familiar with the sidewalk when plaintiff was hurt, and the rise in it, he said: "I am familiar with it; there is an offset in the sidewalk about sixty feet, more or less, north of the north line of Locust street in the

sidewalk on the west side of Third street; in other words, the sidewalk in front of houses 407, 409 and 411, which are houses above grade; that is to say they are not on a line of the grade of the street. Third street, between Locust and Vine streets, has a fall from the north to the south of two feet in a hundred. About 1874 my attention was called to the condition of that sidewalk. My attention was called to it by the city engineer, Mr. Hamilton.

"*Q.* Did you go and examine the sidewalk at that time? *A.* I examined the sidewalk at that time and found that the sidewalk was not on grade, and I notified the parties in interest then to have the sidewalk lowered to the proper grade so as to obliterate this offset.

"*Q.* What was done with the sidewalk? *A.* The party in interest occupying house 407 reduced his sidewalk to the proper grade, which caused a set-off at that point, the other parties not having put their sidewalk down to grade; which offset is there still. The offset is about six inches high and perpendicular. I know of this offset being in the sidewalk since 1874, and I have been an officer in the street department of this city ever since and am still an officer therein.

"*Q.* Third street is a public and improved street is it not? *A.* Yes, it is a public street; it is policed, graded and kept in repair by the city."

Cross-examination: "*Q.* How recently have you examined that street? *A.* I examined it the day before yesterday.

"*Q.* Third street, between Locust and Vine, slants, does it not? *A.* It slants from north to the south. Vine street is higher than Locust, and Washington avenue is still higher.

"*Q.* What is the extent of the slope between Vine and Locust streets? *A.* Well, it is about two feet to the hundred, or whatever length the block is.

"*Q.*  If this little step were not in the pavement, it would be necessary to slant the pavement more, would it not?  *A.*  Yes, sir.

"*Q.*  During that time you have done nothing to change the condition of it?  *A.*  I have no authority to interfere with the matter personally.

"*Q.*  In the city of St. Louis, the condition of the streets, that is the hills and valleys, or what they call the topography of the various localities of the city, makes it necessary in some cases to have these set-offs, does it not?  *A.*  I have never known a set-off to be made in a sidewalk between two cross streets; I have never seen the necessity of making one.  I don't remember ever seeing one in any city I have been in. Nothing in the city of St. Louis, that I can conceive of, would make it necessary to make such a set-off.

"*Q.*  If, when the slant and the general nature of the street was in such a condition that if the pavement were made to slant gradually to such an extent that in bad weather in the winter it would make it slippery, in that case would you not deem it advisable to have a step rather than have the slant for the entire length of the street?  *A.*  If a street was being built under my directions, I would not, in any case, advise that course; I know of streets in cities that have sixteen foot fall in a hundred; that is ten feet more than any street we have here, except Washington Avenue from Main to the river, and there is no offset there; Washington avenue rises twenty-eight feet from Front street to Main.

"*Q.*  There was quite a number of these set-offs too was there not?  *A.*  Not on Washington avenue.

"*Q.*  Have you seen any in St. Louis?  *A.*  I have never seen any.

"*Q.*  If they have any in the city, you do not know it?  *A.*  I have constructed fifty miles of streets here and I have never had one in the street.

"*Q.* Have you ever seen any in other streets?
*A.* I don't remember any that I have seen.

"*Q.* You never saw any, and so far as your
knowledge extends there is none in any city you have
ever seen? *A.* So far as my personal knowledge is
concerned, no. You may take East St. Louis where
they have wooden sidewalks, and all sorts of arrange-
ments, and possibly you will find all kind of steps, but
those are only temporary.

"*Q.* How about Sedalia, Moberly and Jefferson
City? *A.* I don't remember any in Moberly and I
don't remember any in Jefferson City."

Redirect: "*Q.* At this particular place we are
speaking about, where this accident occurred on Third
street, from your knowledge as an expert in the con-
struction of streets, was there any necessity there for a
step, in order to make the sidewalk safe? *A.* In my
judgment, there was none whatever."

John F. Pohlman testified that he was with
plaintiff at the time of the accident; the set-off or step
was in the sidewalk some six inches high; that plaintiff
was going north on Third street and his boot struck the
offset and he fell, and his knee and right arm were
injured; that witness helped him to the cars, and
plaintiff was confined to his room six or seven weeks.
There was a light ahead of them but he couldn't say
whether there was one behind.

The evidence offered by defendant was by super-
visor O'Reilley to the effect that there were two electric
lights between Locust and Vine streets, a distance of
three hundred feet; that they were lit that night; that
the city employs inspectors to see these lights are kept
lit; that between 8 and 9 o'clock that night the lights
were burning, and by policeman Robertson, who said
that to the best of his knowledge the lights were burn-
ing that night between 9 and 10 o'clock. He testified

he knew of the rise in the sidewalk and had known it before May 30, 1891; had not reported it because he had not seen any one fall over it.

The measure of defendant's duty was to exercise ordinary care to render its sidewalks reasonably safe for travel. Whether this sidewalk, with a perpendicular rise of six inches in it, on one of the principal thoroughfares of a great city like St. Louis, was in a suitable state of repair, was a question for the jury, under the circumstances. The learned counsel for the city insists that there was no question for the jury and argues that it was wiser for the city to adopt these perpendicular steps instead of an inclined plane, but it seems to us this consideration is outside the case. According to the engineer of the city, Mr. Macklind, the city had not adopted a plan with steps in it, on the contrary, he distinctly says that his attention was called to it by the chief engineer, and he notified the owners of the adjoining houses to lower this sidewalk to the grade. One complied with the order, the others did not. Hence it can not be said this was the judgment of the city and that question is not before us. According to his testimony there was no necessity whatever for a step in this walk. With an experience of twenty-three years' service for the city, he had never seen a walk on a cross street built that way. There was nothing in the topography of St. Louis that would make such a sudden step off necessary. The notice to the city was positive. For seventeen years it had permitted this walk to remain in this condition, and after it had directed the owner to conform to grade.

We think when the plaintiff showed these facts, and that on a dark night he fell and was injured on account of this defect, he made a case for the jury, and the circuit court correctly declined to take it from the jury. *Norton v. St. Louis*, 97 Mo. 537; *Roe v. Kansas*

*City*, 100 Mo. 190; *Franke v. St. Louis*, 110 Mo. 516; 2 Dillon on Municipal Corp., sec. 1020. There is nothing in *Hubbard v. Concord*, 35 N. H. 52, or *Brown v. Glasgow*, 57 Mo. 159, in conflict with this view.

II. The instructions for plaintiff were in harmony with the principles of law approved by this court in many cases. The court gave all the instructions asked by defendant. The city counselor now complains that instructions number 1 for plaintiff and number 6 for defendant are conflicting. But this alleged conflict grows out of the construction placed by the learned counsel on plaintiff's instruction, rather than the instruction itself. The court did not as a matter of law assume the perpendicular rise was dangerous to travel. As remarked by counsel, that there was such a rise was undenied, but the court expressly required as a condition of recovery that "the said rise rendered said walk dangerous to persons traveling thereon at night." The defendant's sixth instruction was as follows: "The court instructs the jury that the defendant is not obliged to keep its sidewalks perfectly level, and if the jury believe that the general topography of the street rendered such condition of the pavement necessary, they will find for the defendant."

This is not a conflict with plaintiff's instruction, because it went further, and required that the step should be dangerous to travelers. The case was well tried. The defendant obtained the most favorable instructions, and the jury, having found against it, has no cause to complain. The judgment is affirmed. All of this division concur.