THE STATE v. WILLARD J. SHELBY, Appellant.—62 S. W. (2d) 721.

Division Two, August 12, 1933.

*Ellis G. Cook, Theo. J. Wulbur* and *Lee Mullins* for appellant.

*Roy McKittrick,* Attorney-General, *John W. Hoffman, Jr.,* Assistant Attorney-General, *Stratton Shartel* and *Walter E. Sloat* for respondent.

LEEDY, J.—Appellant was charged by information in the Circuit Court of Atchison County with the crime of rape, it being alleged that the offense was committed on or about the 6th day of July, 1927, upon one Elfrieda Shelton, a female child under the age of sixteen years. Upon a trial he was convicted, and sentenced to imprisonment in the penitentiary for a term of two years, and from such sentence this appeal has been duly prosecuted.

The sufficiency of the evidence to sustain the verdict is not challenged. Appellant was a married man, about thirty-eight years of age, at the date of the commission of the alleged offense. The prosecuting witness, under her own testimony, as well as by the certificate of her birth, and the evidence of her mother, was shown to have been born out of wedlock in Douglas County. Missouri, on February 2, 1913, and was, therefore, fourteen years of age at the time in question. However, there was evidence introduced on behalf of appellant to the effect that the prosecuting witness had made statements to some of her schoolmates when living in Douglas County, concerning her age which tended to show she was considerably older than sixteen years at the date of the commission of the alleged offense.

The evidence offered on the part of the State disclosed that in the fall of 1926, the prosecuting witness, with her mother and stepfather, Mr. and Mrs. Riley Shelton, moved to a farm in Atchison County known as the Shelby place, owned by appellant's father, where farming operations were carried on by appellant in partnership with his father. It appears that the family first moved to Atchison County in 1922. Appellant lived in the town of Westboro, and devoted at least a part of his time to his occupation as a motor car salesman under employment by a firm at Shenandoah, Iowa, and his territory included Atchison County where he had formerly been in the automobile business. In the fall of 1926, appellant assisted the Sheltons in picking the corn crop raised on the Shelby farm where the Sheltons then lived as tenants. During that period he ate some of his meals with the family, stayed all night at their home on numerous occasions, played cards with them and became acquainted with the prosecuting witness, and the relations between himself and the Shelton family

became otherwise cordial and friendly. Prosecutrix testified that one night in February, 1927, at the Shelton home, while she and appellant were engaged in a game of cards in the kitchen, which was adjacent to the room in which her mother and others were present, appellant wrote a note asking prosecutrix to accompany him to Shenandoah, Iowa, the next day. Pursuant to an arrangement entered into between them, she left the Westboro School, which she regularly attended, the next day at noon, met appellant about a mile west of town, and accompanied him to Shenandoah, Iowa, and on the return trip, prosecutrix testified that appellant, for the first time, had sexual intercourse with her, and that she was fourteen years of age at that time. Prosecutrix testified to three other acts of sexual intercourse with appellant prior to the date of the offense charged in the information—one of such times being in March, 1927, at the shop or garage in Westboro where appellant kept his car; once in April, 1927, on the road between Westboro and the home of prosecutrix, when the latter's two-year-old sister was in the back seat of the car, and once on a Sunday afternoon in June, 1927, at the Walt Matheny farm.

During the evening of a day in July, 1927, which prosecutrix in her testimony fixed as the 6th (the date alleged in the information) by invitation of her stepfather, Riley Shelton, appellant ate supper with the Shelton family at the Walt Matheny farm, to which place they had removed from the Shelby farm about the first of March of that year. It was admitted that after having the meal referred to, Riley Shelton, his wife, their infant daughter, and the prosecuting witness were taken for a car ride by appellant, and that they returned home about 9:30 o'clock, P. M. There was a very sharp conflict in the testimony as to the events occurring immediately thereafter. Elfrieda's mother testified that she and her husband alighted from the car, and, after inviting appellant to spend the night with them, which he declined on account of an impending rain storm, told him goodnight, and carried their infant into the house; that Elfrieda remained in the car with appellant, and that after putting the baby to bed, and Elfrieda not having come into the house, she went back after her daughter, who at that time was just getting out of appellant's car, and said to her mother that appellant had been teaching her to drive the car. Elfrieda testified that in the interval between the time the family left the car and the time her mother returned, she and appellant drove down the road about a quarter of a mile, parked the car, and there appellant had the act of sexual intercourse with her which is the basis of this prosecution. She further testified that as a result of such act, she became pregnant, and on March 8, 1928, gave birth to a baby which the attending physician described as being a full term baby because of its general appearance, and the fact that its finger nails and toe nails were fully developed. Another physician

who saw the baby about three weeks after it was born testified, "It looked to me like it might have been a full term baby—well developed."

Appellant's version of what transpired on returning from the car ride in question is disclosed by the following excerpts from his direct examination, which constitute the whole of his evidence on the question:

"Q. What occurred up there? A. Well, it was coming up a rain, and Mr. Shelton asked me to stay all night. I said, No, I would have to get on in 'cause I had to work. I stayed there possibly five minutes or ten, and they got out of the car, and I went on in to Shenandoah.

"Q. Who got out of the car? A. The entire family got out.

"Q. Did Elfrieda get out? A. Yes, sir, she did.

"Q. Tell the court and jury whether or not you turned your car around and went back down towards the Sam Jones place and had sexual relations with her? A. I did not. I went straight on north until I hit the other highway that goes into Shenandoah."

The State's evidence further tended to show that on the day after the baby was born, appellant went to the Shelton home (whether in response to a request by Elfrieda is not entirely clear from the record before us) and upon entering the bedroom occupied by Elfrieda and her baby and in the presence of Mrs. Shelton made the following statement: "I am very sorry about all this; I didn't really expect it till the 15th and I wanted to tell you folks to make arrangements." That he left some money to get clothes for the baby and said, "I will come back tomorrow and bring money for the doctor bill." That he did return and left a sum of money sufficient to pay the balance owing the attending physician, which was so applied; and that appellant went frequently to the Shelton home for some considerable time, and furnished a car for Elfrieda's use.

The prosecuting witness testified that appellant promised her if she "got in trouble" as a result of their relations, he would take her off to some remote place where they were unknown and marry her; that after she discovered her condition of pregnancy she communicated that fact to him, and after some negotiations with a view of having a criminal operation performed, which were unsuccessful, appellant requested her not to make complaint because it would not only prevent his getting a divorce, but would result in his being sent to the penitentiary, her being sentenced to the reform school, and the child sent to an orphan's home, and that he would divorce his wife and marry her; that for those reasons she remained silent and did not disclose to anyone, even her mother, who was responsible for her condition. She further testified that after appellant's wife had secured a divorce, on her cross-bill, and she discovered he had married another, she preferred this charge, which was filed October 25, 1928.

Appellant stoutly denied his guilt, and denied ever at any time

having improper relations with the prosecuting witness. He denied advancing the money for baby clothes and the doctor's bill and being present at the Shelton home the day after the baby was born, or making the statements attributed to him by prosecutrix and her mother, as well as any promise to marry Elfrieda, or request that she make no complaint on account of the consequences detailed by her. He offered evidence touching his good character, which the State made no direct effort to rebut. He further testified that a few days before he was arrested, the prosecuting witness, in company with her mother, called on him at his garage in Westboro, and inquired if he was married, to which he replied, "Yes, I guess I am." That the prosecuting witness then demanded that he give her a new car, which she pointed out, under threat that his refusal would result in his being sent to "solitary confinement." In this he was corroborated by one of his employees. Elfrieda and her mother admitted being present on the latter occasion, and making the inquiry with respect to appellant's marital status, and both testified that merely a request was made for the use of a car which appellant had promised, but had not delivered.

The errors assigned relate to (a) the alleged improper admission of the certificate of birth of the prosecuting witness; (b) the exclusion of the proffered evidence of a grand juror respecting the evidence of Mrs. Shelton as a witness before that body; (c) the refusal of instructions, and (d) that the verdict was coerced by the court. These we shall consider in the order given above.

■ I. The State introduced in evidence the original birth certificate of the prosecuting witness, which was produced and identified by the Assistant State Registrar of Vital Statistics as a permanent record of his office, and of which he was custodian. It is strenuously urged that it was error for the court to admit such birth certificate, for the reason that it appeared from the testimony of the assistant state registrar, as well as from the instrument itself, that the name of the child was not written therein by the attending physician who prepared the certificate, and that the same was written in different ink, by a different hand, and at a time subsequent to the filling in of the other parts of the blank. The evidence strongly tended to show that the name of the child was written in the same handwriting, and with the same ink as the signature of the local registrar. Appellant cited no authorities in support of his contention. The certificate in question is required by statute to be kept and preserved. [Art. II, Chap. 52, R. S. 1929.] Section 9053, Revised Statutes 1929 (Mo. St. Ann. sec. 9053), provides what the certificate of birth shall contain, and it will be observed that by paragraph two thereof, it is provided: "If the living child has not yet been named at the date of filing certificate of birth, the space for 'full name of child' is to be left blank,

to be filled out subsequently by a supplemental report, as hereinafter provided." Then follows Section 9054 (Mo. St. Ann. sec. 9054), which, in substance, provides that the local registrar shall deliver to the parent of a child whose certificate of birth is presented without the statement of the given name, a special blank for the supplemental report of such given name, which shall be filled out and returned to the local registrar as soon as the child shall have been named. It seems to us, under the facts above outlined, and in view of the statute just referred to, the court below, in the absence of evidence to the contrary might properly have indulged the presumption of right acting and performance of duty by officials charged with the enforcement of the law governing registration of vital statistics with respect to the certificate in question, and admitted it on that ground. But there is another, and more compelling reason why the action of the court in admitting the instrument was proper. By Section 9060, Revised Statutes 1929 (Mo. St. Ann. sec. 9060), it is provided that a properly certified copy of the record of any birth registered under the provisions of Article II, Chapter 52, Revised Statutes 1929, "shall be prima facie evidence in all courts and places of the facts therein stated." In the very recent case of State v. Worden, 331 Mo. 566, 56 S. W. (2d) 595, the question of the admissibility of a certified copy of such a certificate in a proceeding of this character was before this court. In an opinion by Judge WHITE, it was held, "Since original (birth) certificates . . . are required by statute . . . to be permanently kept, *such certificate becomes an official record, which is always admissible in evidence.* A copy of a public paper required to be filed, certified by the officer intrusted with its custody, is admissible in evidence if the original is admissible. [Citing cases.]" (Italics ours.) It necessarily follows that the converse of the latter proposition stated is true—that is, if the certified copy is admissible, then certainly the original is likewise admissible. It would be anomalous, indeed, to hold inadmissible an original document, a certified copy of which is by statute made prima facie evidence, and we decline to so hold.

■ II. Complaint is made of the ruling of the court in excluding the evidence of one Patton, a member of the grand jury at the August, 1928, Term of the Atchison Circuit Court, which body, it appears, had under investigation the matter of prosecutrix's defilement. Upon objection by the State, the court sustained an objection to, and excluded an offer of proof that the mother of the prosecuting witness testified before the grand jury "that it is nobody's business whose child it is; if the grand jury will tend to their own business, and the people tend to their own business, 'We will raise the child.'" If admissible at all, proof of Mrs. Shelton's evidence before the grand jury, was for the purpose of impeachment, and the language

616

attributed to her, and embraced in the offer, not being shown to be in contradiction of her evidence at the trial, we conclude the offer was properly refused.

■ III. (A) Complaint is made of the action of the court in refusing to give Instructions B, C and D, requested by defendant, which were based on the failure of the prosecuting witness to make complaint of the alleged rape as soon thereafter as opportunity afforded, and tell the jury, respectively, that such failure to make timely complaint (a) is inconsistent with defendant's guilt, and renders the charge of rape upon her by defendant improbable; (b) and for that reason the jury should cautiously consider her testimony upon that point; and (c) is a reason for doubting the veracity of her story. The propriety of giving instructions of this character, where, as here, the charge is statutory rape, has been under consideration in numerous cases in this court, and an examination of those cases discloses a uniformity of ruling against the contention of appellant. They hold that, as neither consent, nor the want of it, nor force are elements of the offense, it makes no difference, in law, whether the prosecuting witness made timely complaint, or whether she ever made complaint at all, and, therefore, instructions of the kind in question are properly refused. [State v. Bowman, 278 Mo. 492, 213 S. W. 64; State v. Palmberg, 199 Mo. 233, 97 S. W. 566; State v. Hammontree, 177 S. W. 369.]

■ (B.) Error is assigned in the refusal of the court to give an instruction on circumstantial evidence, being refused Instruction F. It is a sufficient answer to say that the State's case was made out by direct evidence, and was not based solely upon circumstantial evidence, and in such a situation, under the repeated holdings of this court, it was not error for the court below to refuse to instruct upon the law of circumstantial evidence. [State v. Dickens, 285 S. W. 445, and cases there cited; State v. Atkins, 292 S. W. 422.]

■ (C) Refused Instruction G, offered by appellant, told the jury that "if the prosecuting witness or any member of her family, in her presence, made attempts at extortion from, or any threats against this defendant, such facts, if you find them to be facts, should be taken into consideration by the jury in determining the weight and value of such witness's testimony." The court gave a general instruction on the credibility of witnesses, in a form approved by this court, and the instruction requested was properly refused because it was an unwarranted comment upon the evidence, and invaded the province of the jury.

(D) For like reasons it was proper for the court to refuse Instruction II, which told the jury that it was the duty of Mrs. Shelton, as the mother and natural guardian of the prosecuting witness to make complaint of any alleged defilement of her minor child as soon as she

knew of such, or had reasonable grounds for so knowing, or as soon thereafter as opportunity presented itself for such complaint, and a failure on her part to make due and proper complaint thereof, in the absence of a proper explanation of such neglect of duty "is in itself a reason for cautiously considering her testimony, and may furnish a basis for an inference of improper and illegal motives on the part of the said Elgerda Shelton in so concealing any alleged ravishment of her minor child." The same vice inheres in Instruction I, which is of the same general tenor, and so it, too, was properly refused.

IV. The remaining assignment of error is that the verdict returned by the jury was coerced by, and resulted from improper statements of the court made during the course of the deliberations of the jury. It appears that the jury retired to consider of its verdict on Friday afternoon, and returned the same on Saturday night. At about six o'clock, P. M., Saturday, the panel was brought into open court, when and where, as shown by the bill of exceptions, the following occurred:

"THE COURT: Of course, if you gentlemen could have got a verdict you would all have been at home now, and I would have been at home, but you couldn't help it, and so you are here and so am I. I don't know, it may have rained a little and there couldn't any of us get home now if we tried, unless we happened to live on the hard-surfaced highway. How many of you feel like eating supper? I guess you all do. I want the sheriff to take you out and get you a good supper, and then come back and work awhile. Re-read your instructions too. I don't want to drive anybody to do anything that he thinks is wrong under the evidence and the instructions of the Court. That is what we should measure by; we should measure by the evidence and the instructions of the court. We sometimes wonder if juries get as well acquainted with the instructions as they should. The law provides that it is error for the Court to send juries to the jury room without giving them written instructions of the Court, so that they may have them there, so that they may read them and understand them. Is there any legal proposition that is in the way of this jury getting a verdict? Are you differing about what the law is, as shown by the instructions of the Court?

"A JUROR: So far as I know, I don't think there is.

"THE COURT: Well, really, you know, I feel that under all the circumstances that it is my duty and your duty that we keep on trying a little longer. It is just as inconvenient for me as it is for you, and just as inconvenient for you as it is for me. We just stand even on that: we are all away from home, and we would all like to be at home, but our duties prevent us from going home. So I want the sheriff to take you out and get you the right kind of supper, and come back over here, and I will come back over here, and we will

618

work at it awhile yet. You know that some of these old-time doctors tell me as long as there is life there is hope, and you gentlemen all look like you are fully alive, and you may be able to get some of these things out of the way. In the judgment of twelve men there is wisdom when they agree.

(Thereupon, the jury withdrew from the court room, after which the following occurred, out of the presence and hearing of the jury.)

"MR. COOK: We save exceptions to the statements of the Court. There is one thing the Court told the jury, that it was in evidence that this had been the second trial.

"THE COURT: It is.

"MR. COOK: And that it would be necessary to call in fifty or sixty men, or such a number, to re-try the case—the language is in the statement—and the Court asked the jury if there was any law that was bothering them—

"THE COURT: Yes, if they had any misunderstanding, I said, based on the instructions.

"MR. COOK: And the answer of the juror, apparently the foreman, that he didn't think so. Then the remarks of the Court following that in the judgment of twelve men there is wisdom, and the jury generally gets right—

"THE COURT: If they agreed.

"MR. COOK: Now, I think there is the point. Now if the Court please, upon the question by the Court to the Jury as to how they were getting along and their prospect, one of the jurors arose—it is apparently the foreman of the jury—and explained to the Court that he didn't think they could reach a verdict, and another of the jurors advised the Court that they had done their best, and practically had been dead-locked since last night. Now, that the jury has been out since four o'clock yesterday, and it is now six o'clock, P. M., a longer holding of the jury together would be, in the opinion of the defendant, coercive, based upon the time that the jury has deliberated, together with the statements of the jurors to the Court that there is no chance for a verdict, and we move the dismissal of the jury.

"THE COURT: Which motion to discharge the jury will be, by the Court, over-ruled at this time. To which action of the Court in over-ruling the Motion of the Defendant to discharge the jury the defendant, then and there at the time excepted, and still excepts."

By affidavits incorporated in the motion for new trial, defendant sought to establish, in addition to the foregoing, certain other remarks addressed by the court to the jury, at the time above referred to, and on the hearing of the motion offered to prove the same by such affidavits and oral testimony. We are precluded from considering such additional statements so alleged to have been made by the

court because of the long line of cases holding matters of that character cannot be established by affidavits, but must be preserved by, and appear from the bill of exceptions. [State v. Smith (Mo.), 256 S. W. 1025; State v. Lloyd (Mo.), 217 S. W. 26, and cases there cited; State v. Peters (Mo.), 242 S. W. 894; State v. Valle, 196 Mo. 29, 93 S. W. 1115; State v. McAfee, 148 Mo. 370, 50 S. W. 82; State v. Williams, 147 Mo. 14, 47 S. W. 891.]

██ The length of time a jury will be kept together is a matter within the sound discretion of the court, and we think, under the circumstances, it was not error for the court to point out the desirability of reaching a verdict, in view of the express admonition that the court did ''not want to drive anybody to do anything that he thinks is wrong, under the evidence and instructions of the court,'' and it was emphasized that in its deliberations the jury was to be guided by the evidence and instructions. No opinion was expressed as to the merits of the case, nor was there anything in the remarks from which it might be inferred what views the court entertained on the question of defendant's guilt or innocence, nor any suggestion as to what the verdict ought to be, and we think from what was said by the court, the jury was as likely to find one way as the other, and so the point is ruled against appellant.

We have examined the record, and find it without error. The information follows the language of the statute, and is in approved form. Appellant was represented by able and industrious counsel, and the case was well, and we think, fairly tried. The jury saw and heard the witnesses, and we are not authorized to disturb its findings on disputed questions of fact, if supported by any substantial evidence. From what has been said, it follows that the judgment must be, and it is hereby affirmed. All concur.