VERDA PANDJIRIS v. OLIVER CADILLAC COMPANY, a Corporation, Appellant.—98 S. W. (2d) 969.

Division One, November 12, 1936.

*Fred H. Blades, Moser, Marsalek & Dearing* and *Wm. H. Allen* for appellant.

*Walter Wehrle, Harvey B: Cox* and *Foristel, Mudd, Blair & Habenicht* for respondent.

HAYS, J.—In this action for damages for personal injuries the Oliver Cadillac Company, a corporation, has appealed from an adverse judgment for thirty thousand dollars.

Respondent's petition alleged appellant's ownership and exclusive possession and control of the building in which it conducted its business, the falling of a brick from the third story thereof upon the respondent's head, due to general negligence of defendant, and resulting in injuries to respondent; for which she prayed damages in the sum of $100,000.

The answer was a general denial.

The testimony in behalf of respondent went to show that on October 4, 1932, at about seven-thirty P. M., the evening of the Veiled

Prophet's parade, respondent, a married woman thirty-seven years old at the time of the trial below, was standing with her husband and some friends on the sidewalk on the south side of Laclede Avenue, a short distance west of Sarah Street in the city of St. Louis, near the north wall of a building owned and occupied by the appellant and situated at the southwest corner of Laclede Avenue and Sarah Street and abutting upon said sidewalk. While thus standing upon the sidewalk near the building, the respondent was struck on the head by a half-brick, weighing two and a half pounds, that fell out of the wall of said building from a point adjacent to the side of a third-story window. She was knocked down and rendered unconscious. She was carried into the office of Dr. Funsch, located near the scene of the casualty, who took her to a hospital for an immediate operation.

Witness Kessler testified that he and his wife were standing on the sidewalk that evening near this building, not far from respondent, when he heard a "grating noise" above his head, "toward the building," and about the same time he heard a thud on the ground and looked around and saw respondent lying on the sidewalk. After the accident he saw two bricks that were loose "alongside of a window." Mrs. Kessler testified that immediately before respondent was struck she heard a "terrible noise," which was "like a window opening;" that after respondent had fallen to the sidewalk there was a half-brick lying nearby, and she observed a hole in the building, the place where, she knew, the brick came from was a third-story window.

Carl Gelan, an employee of defendant, referring to the photographs put in evidence, testified that the point identified thereon as being the place from which the brick fell was on the west side of the first window from the corner and corresponded with the sixth brick from the base of the window. He said the windows had metal sash. They were opened by a lever attached to the middle of the bottom of the sash which shoved the lower half of the window outward. The half-brick fell about thirty-four feet. After the accident the brickwork at this window, where the brick was missing, was found to be intact, firm and solid, except at the one point where there was one brick loose and a half-brick out; that appellant reinstalled the loose whole brick and replaced the half-brick in a day or so; that it was the custom never to open this window and the one immediately west of it.

George Bauer, the appellant's secretary, as respondent's witness, testified, among other things, that many people were in the building that night, viewing the parade; that this particular window was one that was never opened; that the third-story windows on the north side of the building, toward the east end, were kept closed to keep

the dust and dirt from the street out of the room at that corner of the building where cars were kept for exhibition and sale.

This was the gravaman of respondent's case in chief as shown by appellant's printed abstract. It is conceded that the petition was properly framed to invoke the doctrine *res ipsa loquitur*.

I. It is contended that the evidence in respondent's behalf was insufficient to take the case to the jury, because (1) such evidence permits no inference other than that the falling of the brick was directly and proximately due to the pushing open of a window of the building by someone; (2) the facts relied on were not such as to reasonably exclude any other hypothesis than that of the negligence claimed. The latter contention is predicated upon the cases of Grindstaff v. J. Goldberg & Sons Structural Steel Co., 328 Mo. 72, 80, 40 S. W. (2d) 702, and Removich v. Construction Co., 264 Mo. 43, 173 S. W. 686; neither of which, we think, is applicable to the present situation. In the first of those cases the only facts shown by the evidence were the breaking of a chain by which a heavy steel truss was being hoisted and carried, and which, when the chain broke, fell upon the plaintiff, a workman in the steel plant, who pulled the rope of the motor by which the crane was set in motion. The court held that the mere breaking of the rope did not make a submissible case either with or without the doctrine *res ipsa loquitur*, since there was no evidence of the size, weight or tensile strength of the chain, or that there was anything unusual or abnormal in its action, or that there was a defect in its construction, or that it was obviously unfit for the purpose of which it was used. To that case the Removich case is similar. The case at bar is distinctly different, and the doctrine *res ipsa loquitur* applies. [Gordon v. Packing Co., 328 Mo. 123, l. c. 140, 141, 40 S. W. (2d) 693; Walsh v. Southwestern Bell Tel. Co., 331 Mo. 118, 52 S. W. (2d) 839.] That will appear more fully in the progress of this opinion.

If, as is contended, the evidence introduced by respondent shows the precise cause of the casualty the benefit of the rule *res ipsa loquitur* was waived or lost. [Conduitt v. Gas & Elec. Co., 326 Mo. l. c. 143, and authorities there cited.] But even so, the cause specifically shown is not necessarily insufficient to take the case to the jury. However, we are not of the opinion that the facts shown by respondent's evidence did clearly show what caused the brick to become detached from the wall and to fall. [Lober v. Kansas City (Mo.), 74 S. W. (2d) l. c. 819.] The evidence on behalf of respondent merely showed a situation which, if unexplained, gave rise to a permissible inference that the object's fall was due to appellant's negligence. Even if it were inferable from the evidence on respondent's behalf that at the time the brick fell a window had been opened,

that still would not explain how or why the brick became detached from the wall and fell.

It is next urged that the court should have directed a verdict for the appellant at the close of all the evidence, since (1) the appellant cannot be held liable for the falling of the brick "through some agency not under appellant's control," and (2) the presumption or inference of negligence, if any, arising under the *res ipsa loquitur* rule, instantly disappeared upon the incoming of appellant's proof that the act which caused the brick to fall was that of a trespasser on the premises. These contentions are predicated upon testimony of appellant's witness Wunderlich, which was in substance as follows:

The witness was in the employ of the Ford Motor Company of St. Louis, as stock superintendent. Purposely going to the Cadillac building to view the Veiled Prophet's parade, and upon arrival observing a number of persons going into that building, he with his wife and child walked in also and proceeded with the others to the second floor. There was "such a tremendous crowd there around the windows" that he went on to the third floor where he found "the same condition at a number of windows. He proceeded to the window in the northeast corner of the building (the window in question) where he stopped to view the parade. The window was then open approximately eight inches. He opened it some four inches more to afford a better view at the bottom for his child. If he displaced the brick in doing so, he was not aware of it. Some fifteen minutes later one of the officials of the appellant appeared, said a woman had been seriously injured, and asked if there had been a brick lying in the window. The witness answered he did not see any. Upon investigation the official discovered that a brick was missing at the side of the window that the witness had raised. He made no inquiry as to who raised the window. Subsequently (when or why does not appear) the witness reported to the appellant he had raised the window. The officer referred to by witness was Bauer, appellant's secretary, who, as already shown, had given orders that this window and another one be not opened. He also testified that after the accident he went to the third floor and made inquiry as to who had opened this window and no one admitted opening it.

There was evidence tending to show that although the appellant had issued no special invitations, it was keeping open house on the occasion for its patrons, its employees and their friends. It also appears that the Ford Motor Company's place of business, where witness Wunderlich had been employed for sixteen years, was located at Sarah and Forest Park Boulevard, inferentially off the route of the parade and one block distant from the Oliver Cadillac Building.

In support of its assertion that the brick fell through some agency not under appellant's control, the appellant cites and relies upon the case of Rice v. White (Mo.), 239 S. W. 141, which was a case of

specifically alleged negligence, involving the fall of a window pane. In that suit the plaintiff failed to make a prima facie case through failure to prove one or more of the specific acts charged. The window pane fell from a window in the second story of the building which was in the sole control and possession of a lessee thereof—not made a party to the suit—who, under the terms of the lease, was obligated to repair and maintain that portion of the building. With respect to the defendants, namely, a municipality and the individual owning the building, the court (l. c. 145) held them not liable on the ground, among others, that they were not in possession or control of that portion of the premises from which the glass fell. It seems obvious that the rule there applied can have no application to the present situation other than to point to the fact that liability attaches only to the right of control. And the legal requirement is that the instrumentality which caused the particular injury must have been under the management and control of the defendant.

The appellant urges that there was no such control in this instance because appellant's evidence disclosed that the act of a trespasser (Wunderlich) caused the brick to fall and that this court should so hold as a matter of law. Whatever the status of Wunderlich may have been, we are of opinion that the evidence was ample to support an inference that the appellant, shown to have been the owner in possession of the premises, was in the legal view in the exclusive control thereof. In McCloskey v. Koplar, 329 Mo. 527, 46 S. W. (2d) 557, a falling-object case, our court en banc pointed out that the requirement referred to above does not mean actual physical control, but refers rather to the right of control at the time the negligence was committed. This right of complete and exclusive control was indisputably shown by the evidence to be in the appellant.

Again, the appellant was in the actual exercise of control. As stated above, earlier in the evening its secretary directed persons near the window not to open it. This bit of evidence would support an inference that the secretary, in view of the circumstances that other windows on the same floor were open and in use by visitors, may have had other reasons for keeping this particular window closed on this special occasion than merely for the exclusion of street dust. Under the circumstances of the case appellant was charged with actual notice that the window would likely be opened by some visitor. But be that as it may, under the *res ipsa loquitur* doctrine proof of notice to the owner of the defective instrumentality which caused the injury is not required. [McCloskey v. Koplar, supra; Frank v. City of St. Louis, 110 Mo. 516, 19 S. W. 938.] Furthermore, as regards Wunderlich's status, it is worthy of note that the appellant was conducting a business ordinarily open to the public. The building being on the line of the Veiled Prophet's travel, the upper-story windows furnished desirable vantage points from which

to view that spectacle. In view of the business with which Wunderlich was connected, its proximity to the Cadillac building, the likelihood of his acquaintance with employees of appellant, and in view of the fact that for some reason not disclosed he made a subsequent report to the appellant, it was fairly inferable, if his testimony were believed, that he was at least a licensee, if not an invitee, of appellant. Among other permissible inferences were these, that if the half-brick was dislodged by the raising of the window, that might have resulted from the act of the individual who first partly raised the window— possibly immediately before Wunderlich came on the scene—though so far as the oral testimony goes, neither one of those two raised the window as high as the brick's point of placement in the wall; also, the brick previously may have been removed, because of being loose, and placed upon the windowsill, and caused to fall thence either by raising the window or in some other manner. It is difficult to conceive of this brick's falling, unless the wall and window were improperly constructed or in a state of disrepair. In either of which events negligence on the part of appellant was inferable.

It is therefore quite plain that this case is typical of a great number and variety of cases having to do with injuries caused by falling objects, to which class of actions is peculiarly applicable the doctrine of *res ipsa loquitur*, to-wit: "Where the thing which caused the injury complained of is shown to be under the management of defendant or his servants and the accident is such as in the ordinary course of things does not happen, if those who have its management or control use proper care, it affords reasonable evidence, in the absence of explanation by defendant, that the accident arose from want of care." [45 C. J., p. 1143; collation of cases, Id., p. 1201, note 21.]

Plaintiff's proposition that the inference of appellant's negligence which said rule authorized in the premises dropped out of the case on the coming in of rebutting evidence offered by the appellant, is untenable. This inference, or the probative force of the facts which authorize the same perforce of the rule stated, was not evanescent, as was the mere procedural inference which was under consideration and which was distinguished in State ex rel. Kurz v. Bland, 333 Mo. 941, l. c. 946, 947, 64 S. W. (2d) 638, l. c. 641, and similar cases cited by appellant.

In the above-cited case we referred to the settled rule in this jurisdiction, "that the burden of proof never shifts and that the presumption raised by the doctrine of *res ipsa loquitur*, relating as it does to the burden of proof, remains in the case to the end and will take the case to the jury, notwithstanding the evidence, however probative, given in rebuttal on behalf of the defendant;" citing Gannon v. Gas & Light Co., 145 Mo. 502, 46 S. W. 968, 47 S. W. 907; Bond v. St. Louis-S. F. Ry. Co., 315 Mo. 987, 288 S. W. 777; McCloskey

v. Koplar, supra; Conduitt v. Gas & Elec. Co., supra. And when all the evidence is in, it is then for the jury to say whether the preponderance thereof is for the plaintiff. [Blanton v. Dold, 109 Mo. 64, 18 S. W. 1149; Chaisson v. Williams, 130 Me. 341, 156 Atl. 154; Crooks v. White, 107 Cal. App. 304, 290 Pac. 497; Sweeney v. Erving, 228 U. S. 233, 57 L. Ed. 815, 33 Sup. Ct. 416.]

As the remaining assignments of error relate to the nature, extent and permanency of respondent's injuries, to certain incidents of the trial, and to the amount of the verdict, a further statement of facts becomes necessary.

The examination made at the hospital disclosed the respondent was dazed, hysterical, bleeding from a lacerated scalp and her right leg paralyzed from a depressed fracture of the skull. Dr. Funsch, with the aid of respondent's family doctor performed an operation. In the top of her head there was a piece of bone the size of a silver half-dollar which was so detached and depressed as to require the opening to be enlarged by cutting off the edge of the opening in order to lift out the depressed piece which had pierced the longitudinal sinus located just above the brain, and normally attached to the roof of the inside of the skull, but which at the time was bleeding profusely. The dura, or membraneous covering of the brain, also had been pierced with fragments of the bone. These, and other foreign substances were removed by the doctors before the wound was sutured and closed. Immediately upon the removal of the bone which had pressed upon the brain respondent regained the ability to move her leg.

Space will not permit the details of the treatment necessary and given respondent in the hospital other than to say that she was supplied with night and day nurses. Dr. Funsch waited upon her daily, and that she experienced the pain and suffering naturally incident to injuries and an operation such as those described and to the normal period of convalescence. When after a few weeks she became able she was removed to her home, where she remained until November 14th following. The wound then gave evidence of infection and she was returned to the hospital for a second operation. Pus which had become pocketed between the dura and the skull was removed. About the end of the year she, though the wound was not entirely healed, was permitted to go to a point in California to which her parents had meanwhile removed. She returned a few days before the trial herein which began on July 5, 1933.

Lay witnesses testified that prior to the casualty respondent was an active and healthy woman, interested in the things of life and did all the work about the home, but seemed changed after the accident; became quiet, melancholy, brooding, nervous, hysterical at times, cried often and sometimes for long periods without explanation and from no apparent cause. The medical witnesses had observed the respond-

ent during the period between her return from California and the trial.

Dr. Funsch's testimony, summarized, is as follows: The scar is two and a half inches long and one inch wide at its widest part. The scalp in that area has been sunken to the extent that one can lay one's finger in it. There is no bone at all over that area; no plate; it is covered and protected from outside injury by the scalp alone. The dura now adheres to the scar tissue, a condition not now remediable. Respondent has a tight board-like feeling on top of her head, is an annoying sympton. Her subjective symptoms were these: She is very nervous; when she looks out of a window she becomes dizzy; in walking up or down steps she cannot look up or down for fear of falling, but must look straight ahead; her neck makes a cracking sound in certain movements of her head; she has a soreness in the lower part of her back and is bothered in stooping or in sitting in certain positions; she complains about her knee and ankle, and about a disturbance in her menstrual flow; she is easily excited and upset; she shows effect of spraining her ankle in falling. In response to the Romberg test of equilibrium she swayed to some extent. The eye reflexes were normal. The reaction of the reflexes on the upper and lower extremities were normal, though more than normally active, and the pupils of the eyes were somewhat distended. His opinion was that respondent was suffering functional nervousness from shock and injury; nothing organically wrong with her nervous system or brain. He attributed the pupillary distention to functional disturbance, and, as we understand, the dizziness and the headaches to the adhesions mentioned above, the latter becoming more uncomfortable when she exercises strenuously. The ankle was perhaps sprained in respondent's fall; some effects of the sprain remain. He observed nothing to lead him to believe respondent was mentally unbalanced; he thought she "has everything she says she has, and that her functional neurosis is a genuine trouble." That in saying her condition "might or might not" develop into epilepsy he had in mind the adhesions already mentioned and the laceration of the sinus, since trauma to the brain is one of the known causes of epilepsy, which results from adhesions and pulling. She shows no signs of it now and is doing as well as could be expected. Just what her chances were he did not know.

Respondent's witness Dr. Deppe predicated his views upon much the same objective matters related above. From the examination he made there appeared to be an enlargement of the retinal veins which drain into the sinus referred to above, the effect of which was to interfere partially with the return flow of blood in the head. She showed a positive "Romberg," a decided swaying of the body, and upon her changing to a stooping position, the swaying so increased that she had to be caught to prevent her falling; which substantiates

her complaint of dizziness. Her right foot gave indication that damage had been done to the motor areas of the left side. The adhesions of the scar tissue to the dura interfere with the free movement of the brain, preventing it from moving in accord with the head, thereby causing dizziness. The retinal vein distention was indicative of in-increased intercranial pressure. This distention is permanent, as its correction by surgery would unavoidably rupture said sinus. With respect to her mental soundness he was "not willing to say she is mentally unbalanced . . . but would say she is not mentally normal," judging merely from his observation that she appeared "dull, indifferent, without such interest in being examined as usually patients take."

Appellant's witness Dr. Hillel Unterberg, a specialist in nervous and mental diseases, on two occasions just before the trial examined the respondent. He obtained respondent's medical history. In his opinion she was hysterical, was suffering from a psychoneurosis. He thought the injury aggravated her previous condition, and also that the litigation and the trial aggravated it. His tests showed normality of all the reflexes and their reactions. He conceded that respondent had an organic disturbance in the skull but no disturbance in the brain, or in the central or peripheral nervous system; she had a very serious bony defect and no one could prognosticate exactly concerning her future.

██ II. In the cross-examination of Dr. Deppe appellant's counsel sought to show, by questions adapted to that end, that the doctor had erred in his diagnosis and treatment of an ailment of a relative of the counsel. The court refused to permit the development of that matter on the ground that it was foreign to the issues. Appellant's complaint against that action is not well taken. The cross-examination had proceeded far enough to disclose that the evidence sought was purely collateral, and therefore immaterial to any issue in the case. The witness's answer to a preliminary question was a substantial explanation or denial of the fact designed to be elicited by further interrogation and was conclusive. [28 R. C. L. 613.] So, this was not an improper restriction of the right of cross-examination. [Gardner v. St. Louis Union Trust Co., 85 S. W. (2d) 86, 90.]

██ III. Complaint is made that respondent was permitted to testify that, though she wore glasses for reading before the injury, afterwards it was necessary to wear them all the time. This evidence was developed without objection. When, next, she was asked to describe her vision, or sight, after the accident, she did so, over objection made and exception saved on the ground that impairment of sight was not expressly pleaded, as in fact it was not; but her answer was substantially the same as before. The ruling was made on respondent's counsel's representation that the offer was made to support the

724

theory, within the pleadings, of pressure on the brain resulting from the lacerated and clogged sinus as well as the adhesions between the dura and the scar tissue. There was such evidence in the record. The ruling was in harmony with a number of Missouri decisions. [Gilchrist v. Kansas City Rys. Co. (Mo.), 254 S. W. 161, 164, and cases cited; Miller v. Construction Co. (Mo. App.), 46 S. W. (2d) 948, 951, and cases there cited.] Moreover, impairment of eyesight was not hypothesized in any instruction. We think this ruling was not prejudicial.

■ IV. The next complaint is of prejudicial argument made to the jury relative to the burden of proof. We have examined the argument. It was not improper. The objection made by appellant's counsel was: ''That is a misstatement of the law, because the law of this State is what is in the instructions.'' The court agreed with that statement, and the incident was closed, of course without exception saved. It is too plain for discussion, there is no merit to this complaint from any point of view. [Torreyson v. United Rys. Co., 246 Mo. l. c. 707, 152 S. W. 32; Israel v. Railroad (Mo.), 239 S. W. l. c. 84; Anderson v. Sutton, 316 Mo. l. c. 1066, 293 S. W. 770.]

■ V. It was in evidence that respondent's husband was at the time of the trial employed as a driver of a truck for an oil company. Respondent's counsel referred to that fact in argument and said: ''She can't take care of herself. . . . If she has to go to a sanitarium she needs to have funds to take care of herself.'' Appellant's counsel objected to the argument as being ''improper.'' The court overruled the objection, saying: ''The jury will have to read these instructions; the instructions state the measure of damages which they can consider; only those that are in Instruction No. 2 can be considered.'' Exception was saved. Though the argument was perhaps improper, its potential harmful effect was abated by the court's oral direction just stated, and particularly the direction to consider only the measure of damages specified in the instruction designated, which we find to be correct and of which no complaint is made. [See cited cases in Subdivision IV hereof.]

■ We now take up the question of excessive verdict and *remittitur vel non*. It is urged by appellant (1) that the award cannot be sustained upon the theory that respondent may suffer epilepsy in the future, or (1) that any present symptoms may possibly become more pronounced; or (3) by Dr. Deppe's statement that he was of the opinion that respondent was not mentally normal, because the facts on which the opinion was based were not sufficient in substance and probative force to measure up to the legal requirements. As to (3) we agree. [Kimmie v. Terminal Railroad Assn., 334 Mo. 596, 605, 66 S. W. (2d) 561.] The facts upon which the witness purported to base his opinion in that regard are entirely consistent

with mental soundness and besides were completely negatived by the other evidence on that subject. [Sayre v. Trustees of P. U., 192 Mo. 95, 128, 90 S. W. 787.] A mere conjecture, standing on a basis of uncertain inference, does not make substantial evidence. [Copeland v. Hines (C. C. A.), 269 Fed. 361, 363.] It is to be noted that mental normality or abnormality was not hypothesized in the instructions. In these circumstances this feature is not thought to have affected the verdict.

VI. With respect to (1) and (2) it is the settled rule in this jurisdiction that likelihood or possibility of future injury (paralysis or epilepsy), which is as far as the evidence in the record now before us goes, is insufficient to constitute the occurrence of either of those possible results an independent basis of recovery. [Clark v. Ry. Co., 324 Mo. 406, 23 S. W. (2d) 174; State ex rel. Stein v. Becker, 334 Mo. 749, 753, 67 S. W. (2d) 755.] Though respondent so pleaded those prospective results she virtually recedes in her brief from that position. This possibility found no place in the instructions and presumably was disregarded by the jury.

Nor does apprehension by respondent of such probability constitute an element of damages for mental anguish. This for the reason stated above, and for the further and all-sufficient reason there was no evidence of apprehension. [Butts v. Bank, 99 Mo. App. 168, 173, 72 S. W. 1083.]

But respondent's disfigurement, which was pleaded, entitled her to damages for mental anguish, past, present and future. [Shortridge v. Scarritt Est. Co., 145 Mo. App. 295, l. c. 305-306, 130 S. W. 126; Schmitz v. St. L. I. M. & S. Ry. Co., 119 Mo. 256, 24 S. W. 472.] ''The mental suffering is a real injury. It proceeds necessarily and inevitably from the physical injury. It is a natural consequence of the injury. Compensation, omitting this element, is not full compensation.'' [Combs v. King, 107 Me. 376, l. c. 381.] Yet the court below, upon objection made by appellant's counsel, refused the proffer made by respondent's counsel to exhibit to the jury the scar and the depression in the skull. The inference would seem to be inescapable that the disfigurement was revolting in aspect. The disfigurement, the peculiar feeling of tightness and drawing of the wound, the dizziness, the headaches—these at least—as there was substantial evidence tending to show, were serious and permanent effects of the injury.

The remaining question is: Does the amount of the verdict shock the judicial conscience? There is no fixed or rigid standard for determining this question. We look to the precedents for guidance, selecting as nearly as we may those similar on the injuries involved to those at hand and by comparison reach a result which fairness and the right of the matter seem to require. From the many cases we

have examined, we list, without undertaking to review any, the following: Gilchrist v. K. C. Rys. Co. (Mo.), 254 S. W. 161; Boyer v. Mo. Pac. Ry. Co. (Mo.), 293 S. W. 386; Hoff v. Wabash Ry. Co. (Mo.), 254 S. W. 874; Hubbard v. Wabash Ry. Co. (Mo.), 193 S. W. 579; Schuette v. Weber (Mo. App.), 282 S. W. 109; Paul v. Dunham (Mo. App.), 214 S. W. 263; Trowbridge v. Fleming (Mo.), 269 S. W. 610; Roy v. Kansas City, 204 Mo. App. 332; Whitlow v. St. Louis-S. F. Ry. Co. (Mo. App.), 282 S. W. 525; Willitts v. C. B. & Q. Ry. Co. (Mo.), 221 S. W. 65.

After careful consideration of the matter, the court has concluded that the judgment is excessive. If the respondent will within ten days from the filing of this opinion remit $15,000 as of the date of the judgment below, the judgment will be affirmed; otherwise it will be reversed and the cause remanded. All concur.