255 S.W.2d 736 (1953)
HOFFMAN
v.
ST. LOUIS PUBLIC SERVICE CO.
No. 43131.
Supreme Court of Missouri, Division No. 1.
March 9, 1953.
*738 Mattingly, Boas & Richards, Lloyd E. Boas, St. Louis, for appellant.
Mortimer A. Rosecan, Inman, Dyer, Gray & Dreher, Charles E. Gray, Ray T. Dreher, St. Louis, for respondent.
HOLLINGSWORTH, Judge.
This is an action for personal injuries sustained by plaintiff as she boarded a mortorbus operated by defendant in the City of St. Louis. Following verdict awarding her damages in the sum of $8,000 and judgment rendered in accordance therewith, defendant appealed. Error is predicated upon: (1) the verdict-directing instruction given in behalf of plaintiff, (2) admission of incompetent testimony as to plaintiff's nervous condition, (3) improper and inflammatory statements made by plaintiff's counsel during closing argument, (4) prejudicially unwarranted admonition of defendant's counsel during the trial, (5) improper interrogation of the jurors by the trial court as to whether they could reach a verdict, and (6) gross excessiveness of the judgment.
Certain of the assignments on this appeal require us to state the evidence from plaintiff's viewpoint.
Plaintiff, a single woman, twenty-six years of age when the case was tried in December, 1951, was a bookkeeper and accountant at the Jewish Hospital. Between 5:00 and 5:30 p. m., on May 18, 1950, she *739 and several other prospective passengers were at the southeast corner of the intersection of Ninth Street and Washington Avenue for the purpose of boarding a northbound Cass bus. Plaintiff was the only witness who testified as to the manner in which she was injured. Her testimony was: When the bus arrived, it stopped with its front entrance door from one foot to two feet from the east curbing of Ninth Street. She was the first person to enter. She was carrying a large bundle and a small bundle under her left arm and her money in her right hand. She stepped from the curbing to the street and from the street to the bus. "I made the first step quite normally, and I was on the second step; I had my left foot on the second step, with my right foot in the position to go on the floor landing, which is the third step, * * *. Just as I was about to make that last step pulling with my left foot to get to the floor level, the bus gave a sudden jerk which threw me off balance, and I landed with a terrific impact on the second step, with my body twisted to the right of me." She later described the movement of the bus as a "terrific jerk"; she had a feeling of going forward and backward.
When she had fallen, her left foot was out in the street in a straight position from where she was sitting on the second step, with her toe touching the street, her right knee was touching her chin and her dress was above her legs, and she was over on her right side. She was so embarrassed and humiliated that she just sat there for a few minutes. Some of the passengers tried to pick her up, but she was in such an awkward position they could not help her. She had a vague recollection of the operator asking her if she was all right, but was so confused she did not remember her answer. She finally got up on her feet and went back into the bus where she stood until a seat was available. She talked to no one on the bus about the occurrence.
The right side of her back and her right knee and ankle pained her and the knee and ankle were bleeding. When she arrived at her destinationa beauty parlor where she had an appointmentthe operators removed her stocking and washed and dressed the cuts. She went from the beauty parlor to her home in a taxicab. The operators testified that when she entered the shop she was crying and that they removed her stocking, dressed the cuts and applied an antiseptic to her knee and ankle.
Plaintiff's evidence, corroborated by her physician, Dr. Irvin Kotner, a specialist in obstetrics and gynecology and a staff member of the Jewish Hospital and two others, was that for several years prior to June of 1949 she had suffered from painful and irregular menstruation, caused by a retroverted uterus; that in June of 1949 she had been operated upon for that condition by Dr. Kotner, at which time he found and removed a small follicle cyst on her right ovary, which, Dr. Kotner testified, was a very common thing in women of childbearing age, from fourteen to forty-five years; that post-operative examinations made thereafter revealed that by March of 1950 her ovaries and uterus were back to normal in every respect, her menstruation was regular and normal, and she was free from all pain; and he at that time discharged her as recovered.
Upon arrival at her home from the beauty parlor on the day she was injured (May 18, 1950), plaintiff was suffering pain in the area of her right ovary. She went to bed and the pain in that region became worse. On the following morning she consulted Dr. Kotner at the Jewish Hospital, at which time he taped her back and ankle and bandaged her right knee, gave her a sedative and took her home. On the following Thursday he made an internal pelvic examination and "packed" her right ovary. She thereafter saw Dr. Kotner about once a week. Her pain grew increasingly worse and menstrual flow became scant, or not at all, and irregular. In November, she was advised by Dr. Kotner that she should undergo an operation for the removal of the ovary, but she was so reluctant to lose it that the operation was postponed until May of 1951 in an effort to relieve the condition by treatment, which was unsuccessful.
*740 At that time, Dr. Kotner, after consulting with Doctors Allen and Meyerhardt, specialists in obstetrics and gynecology, removed it. He found it to be about the size of a large plum and filled with dark brown fluid, old blood. A normal ovary is the size of an unshelled almond. During the course of the operation, he also removed one of her Fallopian tubes which had become adhered to the ovary.
Assuming the facts testified to by plaintiff as to the manner in which she was injured, as propounded in a hypothetical question, Dr. Kotner stated his opinion: "I feel as a result of that trauma that the patient had a hemorrhage or a rupture of an artery or a vein, or both, in that ovary, with a sudden gushing forth of the blood in that ovary which was the source of that pain and the swelling in that ovary." He also testified that the removal of one ovary would not render plaintiff sterile, and that her ability to conceive with only one ovary was excellent. The loss of both ovaries would render her sterile.
Defendant denied any knowledge of the occurrence until receipt of a letter from plaintiff's attorney dated May 20, 1950. The operator of bus No. 3188 (the number of the bus plaintiff advised defendant she thought she had boarded) denied any recollection of the incident.
Further details of the evidence will be set forth when pertinent to discussion of the various assignments of error.
Instruction No. 1, given at the instance of plaintiff, submitted her case on the merits. After hypothesizing a passenger-carrier relationship, it declared: "* * * and if you further find that while plaintiff was in the act of boarding said bus through its front door the defendant did cause or permit said bus to move and jerk, and if you further find that plaintiff was thereby caused to lose her balance and fall to the steps of said bus, and if you further find that in so causing or permitting said bus to move and jerk the defendant failed to exercise the highest degree of care and was negligent, and if you further find that as a direct and proximate result of such negligence, if any, plaintiff was caused to sustain injuries mentioned in evidence, then your verdict should be in favor of the plaintiff * * *."
Defendant says, first, that although the petition alleged the bus was caused to move while plaintiff was in the act of boarding it, yet her testimony establishes that she was already on the bus when it moved. It is true that literally she was on the bus when it moved, but she also was in the act of mounting the steps to the bus floor; an act which, due to the necessity of making possible the entrance into the bus by the passengers following her, the operator must have known she would perform before coming into a balanced position in anticipation of the bus starting forward; and, in that sense, plaintiff was in the act of boarding the bus when it moved. (The operator had testified that he made a practice of watching the passengers boarding the bus and could always see their progress as they mounted the steps.) We hold that the instruction was not erroneous in hypothesizing a finding that the bus was caused or permitted to move while plaintiff was in the act of boarding it.
Defendant also says the instruction does not require the jury to find that defendant did or omitted doing any specific act that caused or permitted the bus to move, and that plaintiff testified (and so she did) that she did not know what caused it to move; and that she, therefore, failed to prove the specific cause of her injury. The instruction expressly hypothesized a finding that the movement and jerk of the bus was caused or permitted by defendant, and defendant does not question the sufficiency of the evidence to warrant such a finding. The law is clear that any movement of the bus by defendant under the circumstances testified to by plaintiff in and of itself constituted negligence. "In the instance of persons boarding or alighting from a carrier's conveyance, any movement of the vehicle before the passenger has had a reasonable opportunity to reach a place of safety therein or to alight is negligence, rendering the carrier liable for the resulting injuries." 10 Am.Jur., Carriers, § 1432, p. 253. See also 13 C.J.S., Carriers, § 733 h, *741 page 1385; Benjamin v. Metropolitan St. R. Co., 245 Mo. 598, 608, 609, 151 S.W. 91; Hayward v. People's Motorbus Co., Mo. App., 1 S.W.2d 252, 254; Lay v. Wells, Mo.App., 274 S.W. 933; Baldwin v. Kansas City Rys. Co., Mo.App., 231 S.W. 280, 281, 282.
May it be inferred with reasonable certainty that when a motorbus, stopped upon the highway with the operator at the controls thereof, suddenly moves from its stopped position, such movement was caused by an act or omission of the operator? That fact is inferred every day. In many, if not in most, instances, the injured person, whether injured by being struck by the vehicle or as an occupant thereof, is not in a position to know, in the sense of observing, what caused it to move. He merely knows it moved and injured him. In litigated cases he testifies that the vehicle moved, and such testimony is accepted as proof that the movement was caused by an act or omission of the operator.
The record shows that was the theory on which the case was tried. Defendant's operator on cross-examination stated that during ten years of operating buses, he had eight or ten experiences with them moving from a stopped position; and that such a movement could be due to ice permitting the bus to slide (this casualty occurred in May), or due to relaxing the pressure on the brakes. But, regardless of any testimony on the subject, it is, we think, common knowledge that in the absence of evidence tending to show that such a movement was due to an external force, it would be attributed to an act of the operator in releasing the brakes or applying the power, or both. It is of no consequence by which method the operator caused the bus to move. His act, whatever it was, was the act of defendant, and the jury found it was the result of negligence. We hold that the instruction which, following the allegations of the petition, required a finding that defendant "did cause and permit said bus to move and jerk" is a sufficiently specific hypothesization of the operator's act upon which the jury was instructed to determine the issue of defendant's negligence. See Monan v. Arkansas Grocer Co., 216 Mo.App. 289, 264 S.W. 486, 487; Jones v. Central States Oil Co., 350 Mo. 91, 164 S.W.2d 914, 917.
Defendant also says that the instruction is erroneous in that it "authorizes a verdict upon a finding of a move and jerk of the bus when plaintiff's testimony disclosed that it was a sudden and terrific jerk", citing Simms v. Dunham, Mo.App., 203 S.W. 652, 653, 654; Murdock v. Dunham, Mo.App., 206 S.W. 915. Neither of these cases is in point under the pleadings in this case. A "sudden and terrific jerk" would, of course, come within the meaning of the words "move and jerk", as set forth in the instruction.
Defendant assigns error in the admission of testimony given by plaintiff in regard to her nervous condition subsequent to her operation and in permitting her counsel to further enlarge upon such testimony in his closing argument. The petition, in addition to alleging plaintiff's physical injuries, including injuries to her ovaries and female organs, also alleged that "her nerves and nervous system were shocked and shattered; * * * that all of plaintiff's injuries and conditions * * * are permanent." Dr. Kotner testified that since the removal of her ovary plaintiff had been very, very nervous and apprehensive over the fact that she had only one ovary left, and the possibilities if something should happen to her other ovary; and that, from experience, "we do know that these individuals who have only one ovary, they do worry"; and that her nervous condition will never improve.
Plaintiff was permitted to testify, as shown by the record:
"Q. Will you tell us, directing your attention to the state of your nerves and nervous system, what that has been since this operation when you had your ovary and tube removed? A. Yes, sir. I find that I am very nervous and under nervous tension and worried. I know in my own mind that I can still conceive with one ovary, but I also have in the back of my mind that something might happen to that one.
*742 "Mr. O'Brien: I object to it and move it be stricken.
"The Court: Overruled.

* * * * * *
"A. And I know that there are women with two that still don't have them, and I often think of me with one, what my chances are, and I also think of the day that I have to marry and the day I have to tell my future husband of my condition. It is only fair to him that he does know. I am wondering how I am going to tell him and what his reaction will be, and how I will face the future.
"Mr. O'Brien: (Out of the hearing of the jury) I move for a mistrial in the light of the inflammatory, prejudicial, self-serving, inadmissible remarks made by the plaintiff at this time for the reason of the position it places the defendant in the eyes of this jury.
"The Court: Overruled.
"Mr. O'Brien: Exception. I move that the remarks be stricken from the minds of the jury.
"(A neat stroke, if the court could do it!)
"The Court: Overruled."
And then during the closing argument the plaintiff's counsel stated:
"* * * you heard her say this was such a thing that if marriage were offered to her, she would feel out of fairness, she would have to bring her husband to the doctor and let the doctor explain that she is just half a woman. God, what that must do to your nerves to realize when you look at a man and you look him squarely in the eye and you love him
"Mr. O'Brien: I object to the argument.
"Mr. Rosecan: And you know that you are just half a woman
"Mr. O'Brien: Half the time adduced.
"The Court: Overruled.
"Mr. Rosecan: To know in the future, to know if anything should happen to the other ovary you are a castrated case."
The objection now made to this testimony and argument is that the petition did not plead traumatic neurosis and no claim was made that her ability to bear children was injured. No objection was made that the evidence was not within the pleadings, nor was the trial court's attention called to that feature or ground of the objection. Consequently, appellant is in no position to here assert it as a ground for reversal. Johnson v. Kansas City Rys. Co., Mo.App., 233 S.W. 942, 943 [1]. The first objection made was not sufficient to preserve anything for appellate review. Donley v. Hamm, Mo.Sup., 98 S.W.2d 966 [1]. The second objection amounted to little, if anything, more than the first. A mere description of testimony as "inflammatory", "prejudicial", "self-serving", "inadmissible", is generally construed as being merely epithetical in nature and insufficient to present anything for review. Heinbach v. Heinbach, 274 Mo. 301, 202 S.W. 1123, 1127, [7-9]; W. C. Hardesty Co. v. Schaefer, Mo.App., 139 S.W.2d 1031, 1036. "It is well settled that an objection to the admissibility of evidence must be specific and contain the proper ground of its exclusion, else the trial court will not be convicted of error for overruling it." Goodman v. Allen Cab Co., 360 Mo. 1094, 232 S.W.2d 535, 539. There is, however, a modification of this rule when it is apparent that the evidence is self-evidently wholly incompetent for any purpose or it is obviously unjustly inflammatory and prejudicial and can serve no purpose whatever in the case. Hungate v. Hudson, 353 Mo. 944, 185 S.W.2d 646, 648 [1-5], 157 A.L.R. 598.
It is clear, we think, that neither the possibility of plaintiff losing her other ovary and thereby becoming sterile nor any humiliation she would suffer in the event of telling a potential husband of her condition constituted an element of damages for which she could recover. See Pandjiris v. Oliver Cadillac Co., 339 Mo. 711, 98 S.W.2d 969, 977. But, in view of Dr. Kotner's testimony that her worries *743 about such mattters were the common experience of women who had undergone similar operations, we do think they constitute some probative evidence of the extent to which her nervous system had been "shocked and shattered", and that the chimerical nature of her worries tend to accentuate that fact.
As to the argument and the objection made thereto, it would seem they constitute a stalemate; they are equally grotesque. We do not approve of the extremes to which plaintiff was permitted to testify nor the flamboyancy of the argument; but, under the record as made, we cannot say that the court committed reversible error in refusing to exclude either. Neither can we say with certainty that either was prejudicial. Presumably, jurors of adult minds would accept and evaluate this testimony at its true worth: a nervous condition resulting from an operation necessitated by the injuries sustained.
During the course of argument, plaintiff's counsel stated:
"The only eye witness to this accident, unfortunately, is the plaintiff. I say `unfortunately', because had the operator of the bus taken the names of other witnesses, of other passengers on that bus, we could have made them available to you.
"Mr. O'Brien: I object to that and move that be stricken.
"The Court: Overruled.
"Mr. Rosecan: But that was not done."
Defendant says that plaintiff had the same opportunity as the operator to get the names of witnesses who were present when she fell; that the purpose of the argument was to draw an unfavorable inference from the failure of the operator to get them, so that they could be produced in court; and that the witnesses were equally available to plaintiff and it was error to permit such an inference to be argued to the jury.
Again defendant is confronted with the fact that only a general objection was made. Donley v. Hamm, Mo.Sup., 98 S.W.2d 966 [1]. But, we think that the contention now made is without merit. The insinuating intendment that defendant attaches to the argument is not borne out by its content. The only reasonable meaning that can be attached to this statement is that no witnesses were available because of the operator's failure to get their names. The testimony warranted a finding that the operator did see plaintiff fall. Plaintiff's testimony also was that she was in pain, embarrassed and confused. Under these circumstances, it was not amiss to comment upon the result of failure of the operator to get the names of the witnesses.
Defendant next complains that following an adverse ruling by the court, defendant's counsel attempted to "note the ruling", and while so doing the court instructed him to proceed, and that the following then occurred:
"Mr. O'Brien: Judge, I have to get my notes intact.
"The Court: You know we can't wait for you to write everything in longhand.
"Mr. O'Brien: I can't write shorthand.
"The Court: We can't wait for you to write the whole proceedings in longhand. We will have to get along.
"Mr. O'Brien: I'll have to dispense with that?
"The Court: You will have to dispense with that or one or the other.
"Mr. O'Brien: May I ask, does the court instruct me personally not to make notes of the proceedings?
"The Court: I am telling you that we can't wait for you to make longhand notes. That will delay the proceedings unduly."
Timely objection and motion for mistrial were made and overruled. We can attach no prejudicial significance whatever to this colloquy. If either the court or counsel was guilty of "baiting" the other, it was not the court. No display of feeling on the part of the court for or against either of the parties or counsel is reflected in the record of this incident.
*744 Defendant also complains of the action of the trial court in interrogating the jury during the course of their deliberations as to the possibility of their agreeing upon a verdict. The case was submitted to the jury at 11:50 a. m. At 1:00 p. m., they were excused for lunch. From 2:00 p. m., to 4:20 p. m., they continued their deliberations. At 4:20 p. m., the court called them into the courtroom and, in the presence of counsel for both parties, stated:
"Gentlemen of the jury, I am going to ask you a question, but before doing so I want to caution you that I do not wish you to state how you stand, or why you take the positions that you do, any of you. The question I ask you is simply this: Do you believe that if given further time you will be able to agree upon a verdict ? What do you say, Mr. No. 1 ?"
Each juror answered in numerical rotation. Juror No. 1 at first said, "No, I don't. I stand as I stand; I don't change." He later stated, however, that he thought they might agree if given further time. Ten others said they believed there was a possibility of agreement; one expressed an opinion that the possibilities were "poor". The court then said: "The consensus of opinion, if given further time, you can agree upon a verdict. So I will ask you to retire to the jury room and continue your deliberations." At 4:32 p. m., they were returned to their room. At 4:50 p. m., they returned their verdict signed by ten of their number.
The length of time a jury will be kept together is a matter within the sound discretion of the trial court. State v. Shelby, 333 Mo. 610, 62 S.W.2d 721, 726. No abuse of that discretion is shown. There is not the slightest indication of coercion. The assignment is without merit.
Defendant's final contention is that the verdict and judgment rendered thereon is grossly excessive. Much of defendant's argument on this point is based upon the medical testimony introduced on its behalf, which tended to show that the condition of plaintiff's ovary necessitating its removal was not due to her fall but from other causes. That testimony we do not set forth and do not consider for the reason that in determining whether the court erred in holding the verdict not to be excessive we consider the evidence favorable to the verdict and the trial judge's action in approving it. Cruce v. Gulf, Mobile & Ohio R. Co., 361 Mo. 1138, 238 S.W.2d 674, 681; Polizzi v. Nedrow, Mo.Sup., 247 S.W.2d 809, 811.
Plaintiff did not prove any medical expense. She lost no time from her work other than twenty-four days in the hospital and two weeks at her home; and, with the exception of her nervous condition, she had entirely recovered from her operation by June or July of 1951. Since that time she has been free from pain and menstrual disturbance. But the evidence did show that she suffered from pain in her right side from the time of her injury in May of 1950, which grew worse until the operation for removal of her ovary in May of 1951, and during which time her menstrual periods were irregular, requiring her to visit her doctor at weekly intervals; and that she will never recover from the nervous condition which she suffers as a result of her injury and the removal of her ovary.
We have not been cited to, nor have we found, any case based upon injuries analogous to those shown here. The nearest approach to similar facts that we have found are set forth in the case of Keehn v. D. R. F. Realty & Investment Co., 328 Mo. 1031, 43 S.W.2d 416, 418, decided in 1931, wherein the plaintiff's chief injuries were misplacement of a kidney, injury to (but not loss of) an ovary, with a resultant thyroid enlargement, extreme nervousness, dysmenorrhea, etc. In that case a judgment of $15,000 was affirmed. The jury and trial judge, both of whom saw plaintiff and heard the testimony in this case, were in a better position to determine plaintiff's condition than this court. We cannot say that the amount of the verdict and judgment is excessive.
The judgment should be and is affirmed.
All concur.